The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Kam D. KING, Defendant–Appellee.

The People of the State of Colorado,
Plaintiff–Appellant,

v.

Timothy B. Gulick, Defendant–Appellee.

Nos. 00SA207, 00SA222.

Supreme Court of Colorado,
En Banc.

Jan. 16, 2001.

Michael F. Green, District Attorney, Cortez, CO, Attorney for Plaintiff–Appellant.

Richard S. Luhman, Cortez, CO, Attorney for Defendant–Appellee, Kam D. King.

Richard Unruh, Telluride, CO, Attorney for Defendant–Appellee, Timothy B. Gulick.

JUSTICE BENDER delivered the opinion of the court.

In these interlocutory appeals the People challenge suppression orders of the Dolores County District Court. That court held that the encounter between the defendants and the police was not an investigatory stop but rather constituted an arrest and search not supported by the existence of probable cause to arrest. Thus, the trial court suppressed evidence seized incident to that arrest.

We hold that probable cause to arrest exists when, at the time of arrest, the objective circumstances available to a reasonably cautious officer justify the belief that (1) a crime has been or is being committed (2) by the person arrested. Because the police in this case lacked probable cause to believe that the defendants, whom they arrested, had committed or were committing the crime of cultivation of marijuana, we hold that the police acted without probable cause.

We also hold that, when officers use force typically associated with an arrest—such as the drawing of weapons, physical restraint, and the use of handcuffs—the prosecution may not characterize the encounter as an investigatory stop unless specific facts or circumstances exist that render the use of such force a reasonable precaution for the protection and safety of the officers. Because no such facts or circumstances exist here, we agree with the trial court's conclusion that the encounter was an arrest unsupported by probable cause and that the evidence seized incident to that arrest must be suppressed. Hence, we affirm.

## I. FACTS AND PROCEEDINGS BELOW

Based on the trial court's findings and the uncontested testimony of Agents Matt Buffington and Brooks Bennett, who were the only witnesses who testified at the hearing, the pertinent facts are as follows.

In September 1999, a U.S. Forest Service Investigator learned from hunters that a marijuana "garden" was growing in Roche Gulch, Dolores County, Colorado. Roche Gulch is a dead end or "box" canyon. A road leads into the canyon and ends in an area where hunters or hikers can park. A trail leaves from this area. The marijuana garden was clustered around a natural spring hidden above the trail and was divided into eleven plots, containing more than 200 plants. The forest investigator relayed the hunters' information to agents of the Twenty–Second Judicial District Drug Task Force, who went to the site the next day. Agent Buffington took samples of the leaves from some of the plants and these samples tested positive as marijuana. Buffington testified that the agents noticed that there was fishing line around several of the plots on which hung "a green cloth that looked like it had been sprayed with some type of chemical." In the vicinity, agents also found two empty bottles of what Agent Buffington believed was "Grant's deer repel."

While placing a surveillance camera at the garden to monitor activity there, agents found a Continental Airlines luggage tag lying under some bushes between two of the marijuana plots. The luggage tag bore the name "Tim Gulick" and listed a Durango address. This address was not valid, but a Timothy Gulick was listed as living at an address in Montezuma County, Colorado. That Friday, agents went to that address, where they observed a blue Nissan pickup registered to defendant Kam King. Agent Bennett spoke to a person at that address who identified himself as Kam King. In his testimony, Agent Bennett described Mr. King as approximately six-feet tall with dishwater blond hair. None of the agents saw Mr. Gulick, but records showed him as also around six-feet tall but with longer hair, below his shoulders.

The next Monday, officers returned to Roche Gulch to retrieve the surveillance tape and to put new tape in the camera. They viewed the tape they retrieved that day. This tape showed nighttime footage of two men shining flashlights on the marijuana in the garden. Agent Buffington testified that the only distinguishing feature in the tape was that one of the men had long light hair and that he could not determine whether either of the individuals shining flashlights in the garden was King or Gulick.

That night, the agents set up live surveillance at Roche Gulch. Agent Bennett donned night-vision equipment and climbed up a hillside to observe the garden and the road leading into and out of the canyon. He was in radio communication with Agent Buffington, who parked down the road from the Gulch. Dolores County Undersheriff Shane Schmalz was also present. The trial court found that all the officers had agreed they would arrest anyone removing marijuana. After reaching his hillside perch, Agent Bennett viewed a blue Nissan pickup on the road and identified it as the one he observed at the Gulick residence belonging to defendant King. He communicated this information to Agent Buffington.

Approximately one hour later, Agent Bennett watched as two men with flashlights, one carrying a backpack that appeared to be full, the other with long hair and a dog, walked out of the canyon. The trial court found that Agent Buffington suspected that the back-

pack contained marijuana. Agent Bennett testified that, although one of the men appeared to have long hair, Bennett was not able to determine any facial features or other identifying attributes of either man through his night vision goggles. Agent Bennett was also unable to determine whether the men were carrying weapons. After the two men entered the Nissan pickup, Agent Bennett watched them drive out of the canyon. Bennett relayed this information to his fellow officers and ran down the hill to his car.

Agent Buffington and Undersheriff Schmalz followed the pickup in their police vehicles and ordered the car to pull over and stop. The two officers conducted a full felony stop: they drew their guns, ordered the men, one at a time, to exit the car, and directed them to lie face down on the ground. Agent Buffington testified that the purpose of the stop was "[t]o identify the individuals [in the car] and to make sure we didn't have marijuana leaving the garden." He believed marijuana might be leaving the garden via the backpack and that the officers "needed to stop the vehicle for further investigation."

Agent Buffington testified that, before making the stop, he feared for his safety because the stop occurred in an isolated mountain area in which it was difficult to maintain radio contact and because he was told in training that people involved in the growing of marijuana often have weapons with them. However, he testified that no specific facts or circumstances existed or occurred indicating that these defendants would be armed or dangerous.[1]

By the time Agent Bennett arrived, both men were on the ground. Agent Buffington then did a protective search of the cab and camper shell of the pickup finding no other occupants while Bennett and Schmalz handcuffed the men.[2] The trial court found that by this point in time both men were under arrest.

The officers then put the men into the police vehicle. Agent Buffington observed that one of the men had long hair. Buffington and Bennett both testified that they observed the two men had pants that were wet to the ankles and they could smell the odor of live marijuana on the men. Buffington testified that his observations of wet pants, long hair, and the odor of marijuana were all made after the felony stop. There was some ambiguity as to exactly when the officers observed the wet pants and smelled the live marijuana.[3] The trial court resolved this factual issue by finding that the observations of wet pants and the odor of marijuana took place after the point of arrest that is, after Agent Buffington had checked the car's interior for other occupants and the two men were handcuffed. Next, Buffington found the backpack in the back of the truck near the tailgate and testified that, suspecting marijuana was in the backpack, he opened the backpack to find out what was in it. He found milk cartons containing droplets of water and a hand pump, but no marijuana. Buffington testified that there was no specific evidence that this particular backpack contained marijuana:

> Q: ... [A]re there any facts specific to this backpack and this evening that caused you to believe that there was marijuana in that backpack such as a report that someone had seen harvest-

---

1.

> Q: Officer, you indicated a fear for safety and that having something to do with the intensity of the stop itself, firearms drawn, get out, on the ground, all that business.
>
> A: Yes.
>
> Q: Was that a generalized suspicion based upon your training and experience and other marijuana grow investigations and the potential for danger to you, or was there anything fact specific that led you to believe either of these individuals would be armed and/or would bring those arms to bear against you?
>
> A: We didn't have anything indicating that these individuals had anything, no.

2. It is unclear from the testimony at the hearing whether Buffington checked the interior at the same time that Bennett and Schmalz handcuffed the two men, or whether the interior of the car was checked before the handcuffing occurred. The trial court resolved this ambiguity and found that Buffington checked the interior of the car before the two men were handcuffed.

3. Agent Buffington testified that he smelled the live marijuana after the backpack was opened but that Bennett told him that Bennett smelled the marijuana before Buffington opened the backpack. Agent Bennett testified that he was not sure whether he smelled the marijuana odor before Buffington opened the backpack.

ing or, you know, was carrying a machete? Do you know what I'm getting at?

A: As far as that, no. I had talked to Investigator Bennett. Like I said, I later smelled the live marijuana on their clothing.

Agent Buffington testified that if the officers had not, after the arrest, observed the defendants' wet pants, smelled marijuana on their clothes, and found the cultivation implements in the backpack, then the officers would not have any basis on which to continue to hold the defendants.[4]

Both defendants were charged with Cultivation of Marihuana, § 18–18–406(8)(a), 6 C.R.S. (2000), Possession of Drug Paraphernalia, § 18–18–428, Possession of Marihuana with Intent to Distribute, § 18–18–406(8)(b), and Controlled Substance/Special Offender, § 18–18–407. Each defendant filed a motion to suppress the fruits of the search on the basis that they were procured incident to an illegal arrest. The trial court held a hearing in the King case, at which Agents Buffington and Bennett testified. The trial court granted King's motion to suppress. The trial court later held a brief hearing in the Gulick case and issued an identical order. The State filed an interlocutory appeal in each case pursuant to section 16–12–102(2), 6 C.R.S. (2000) and C.A.R. 4.1. Because the pertinent facts and applicable law in both cases are identical, we consolidate them at this time for the purpose of issuing one opinion. *See People v. Blehm*, 983 P.2d 779, 782 (Colo.1999).

## II. ANALYSIS

### A.

When ruling on a motion to suppress, a trial court "must engage both in factfinding—a specific inquiry into the historical phenomena of the case—and law application, which involves the application of the controlling legal standard to the facts established by the evidence." *People v. Quezada*, 731 P.2d 730, 732 (Colo.1987). "A court's findings of historical fact are entitled to deference by a reviewing court and will not be overturned if supported by competent evidence in the record." *Id.* An appellate court, however, has "the responsibility to ascertain whether the trial court's legal conclusion[s][are] supported by sufficient evidence and whether the trial court applied the correct legal standard." *People v. Owens*, 969 P.2d 704, 707 (Colo.1999). If the record is insufficient for this purpose, then the appellate court must remand the case to the trial court for further findings of historical fact. *Id.* When, however, no controlling facts are in dispute, the appellate court may review the issue de novo because "the legal effect of undisputed controlling facts is a question of law." *Id.;* see also *People v. Rivas*, 13 P.3d 315, 320 (Colo.2000); *People v. Winpigler*, 8 P.3d 439, 444 (Colo.1999).

Our federal and Colorado constitutions protect against unreasonable searches and seizures. *See* U.S. Const. amends. IV, XIV; Colo. Const. art. II, § 7. "[W]hen a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person in a constitutional sense." *People v. Pancoast*, 659 P.2d 1348, 1350 (Colo.1982) (*citing Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Thus, "formal arrests or seizures that resemble formal arrests must be supported by probable cause." *United States v. Perdue*, 8 F.3d 1455, 1461 (10th Cir.1993)

---

4. Q: If you conducted your investigation and found them to not be carrying any marijuana or any implements of cultivation, what would you have done?

  A: Are you talking about everything, the wet pants and everything?

  Q: If you had stopped—yeah. If they had no wet pants, if they didn't smell like marijuana, they didn't have any marijuana in their bags, didn't have any cultivation implements, what would you have done?

  A: I would have let them go down the road.

  Q: Do I understand then that you needed to make the stop and obtain what you could from the stop to justify continuing to hold them?

  A: We needed to further our investigation, yes.

  Q: I understand. But you had to have what you found as a result of the stop to justify continuing to hold them, didn't you?

  A: Correct.

(citing *Michigan v. Summers*, 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)). Probable cause is not measured by a " 'more likely true than false' level of certitude but by a common-sense, nontechnical standard of reasonable cause to believe, with due consideration being given to a police officer's experience and training in determining the significance of his observations to the ultimate issue of probable cause." *People v. Ratcliff*, 778 P.2d 1371, 1375 (Colo.1989) (citations omitted). If an arrest is not supported by probable cause, then evidence obtained incident to that arrest must be suppressed. *See, e.g., People v. Diaz*, 793 P.2d 1181, 1183 (Colo.1990). Evidence procured after an arrest cannot be used in hindsight to justify the arrest.[5]

■ Probable cause to arrest exists when, under the totality of the circumstances at the time of arrest, the objective facts and circumstances available to a reasonably cautious officer at the time of arrest justify the belief that (1) an offense has been or is being committed (2) by the person arrested. *Winpigler*, 8 P.3d at 444; *People v. Freeman*, 668 P.2d 1371, 1377 (Colo.1983). "That is, probable cause to arrest requires that at the time an arrest is made the police have probable cause to believe a crime has been or is being committed *and probable cause to believe the person to be arrested has committed or is committing the crime.*" *People v. McCoy*, 870 P.2d 1231, 1235 (Colo.1994) (emphasis added).

■ The second element of probable cause to arrest—the requirement of probable cause to believe the person arrested has committed or is committing the crime—creates a nexus between the suspected crime and the

person arrested. *Cf.* 2 Wayne R. LaFave, *Search and Seizure* § 3.7(d) (3d ed.1996) (stating that probable cause to search a particular place in order to seize a particular object requires a nexus between the crime, the object to be seized, and the place to be searched). This nexus requirement protects people from, among other things, the harmful effects of general warrants,[6] the abolition of which was one of the primary motivations behind the passage of the Fourth Amendment. *See Henry v. United States*, 361 U.S. 98, 100, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *Boyd v. United States*, 116 U.S. 616, 624–25, 6 S.Ct. 524, 29 L.Ed. 746 (1886). "The requirement of probable cause has roots that are deep in our history. The general warrant, in which the name of the person to be arrested was left blank ... perpetuated the oppressive practice of allowing the police to arrest and search on suspicion." *Henry*, 361 U.S. at 100, 80 S.Ct. 168 (footnote omitted). Hence, at the time an arrest is made, police must possess (1) probable cause to believe a crime has been or is being committed, and (2) probable cause to believe the person arrested committed or is committing that crime.

■ An investigatory stop based on reasonable suspicion constitutes an exception to the general rule that seizures of the person must be supported by probable cause. *See Terry*, 392 U.S. at 30, 88 S.Ct. 1868; *Stone v. People*, 174 Colo. 504, 508, 485 P.2d 495, 497 (1971). Reasonable suspicion is both a qualitatively and quantitatively lower standard than probable cause. That is, it can be supported both by less information and by less reliable information than is necessary to establish probable cause.[7]

---

5. If the rule were otherwise, police could use a search conducted subsequent to an arrest to justify the arrest and use the arrest to justify the search. "This will not do." *Johnson v. United States*, 333 U.S. 10, 17, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

6. A general warrant is "[a] warrant that gives a law-enforcement officer broad authority to search and seize unspecified places or persons; a search or arrest warrant that lacks a sufficiently particularized description of the person or thing to be seized or the place to be searched." *Black's Law Dictionary* 1579 (7th ed.1999).

7. Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

An investigatory stop is an encounter in which an officer stops a person to question him or conduct a pat down for weapons. *People v. Smith*, 13 P.3d 300, 304 (Colo.2000); *see Terry*, 392 U.S. at 30, 88 S.Ct. 1868. An officer conducts an investigatory stop "because he suspects an individual of criminal activity and deems it necessary to take action in order to protect himself and those around him." *People v. Archuleta*, 980 P.2d 509, 513 (Colo.1999). Such a stop "must be 'limited to determining an individual's identity or obtaining an explanation of his behavior.'" *People v. Davis*, 903 P.2d 1, 4 (Colo.1995) (quoting *People v. Schreyer*, 640 P.2d 1147, 1150 (Colo.1982)). While investigatory stops are seizures, they "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause." *Summers*, 452 U.S. at 699, 101 S.Ct. 2587. Whether an encounter should be characterized as an investigatory stop or an arrest is an objective inquiry based on the totality of the circumstances. *See People v. Garcia*, 11 P.3d 449, 453 (Colo.2000).

Officers' use of force and shows of force typically associated with arrest—such as the drawing of weapons, physical restraint, and the use of handcuffs—does not always preclude the legal characterization of a given encounter as an investigatory stop. *Smith*, 13 P.3d 300, 305–306. Use of such force does, however, increase the degree of intrusion on an individual's privacy and liberty and "heighten our concern as to whether the action taken exceeds what is reasonably necessary." *Id.* at 305. Thus, while it is not normally proper to characterize an encounter in which such force is used as an investigatory stop, such characterization may be proper when the specific facts or circumstances of the case indicate that such use of force was a "'reasonable precaution for the protection and safety of the investigating officers.'" *Id.* at 305 (quoting 4 LaFave, *supra*, § 9.2(d), at 37.)

"When police detain a person without a warrant, the burden of proof is on the prosecution to prove the constitutional validity of the stop and any subsequent search." *People v. Canton*, 951 P.2d 907, 909 n. 3 (Colo.1998). As part of this burden, in order to characterize a forceful encounter as an investigatory stop, the prosecution must establish the existence of *specific facts or circumstances* that render the degree of force used a reasonable precaution for the protection and safety of the investigating officers. *See Smith*, at 305.

### B.

We apply the principles just discussed by first determining whether the police had probable cause to pull the defendants over, order them at gunpoint out of the pickup and onto the ground, and handcuff them. As discussed, probable cause to arrest exists when, at the time of arrest, the objective circumstances available to a reasonably cautious officer justify the belief that (1) a crime has been or is being committed (2) by the person arrested.

When the police pulled the defendants over in their pickup truck, probable cause existed to believe that the crime of cultivation of marijuana had been committed. The officers had personally visited the garden and tested plants growing there for marijuana. These marijuana plants were not growing naturally and erratically among other foliage on the hillside but instead were planted deliberately in eleven distinct plots. In an apparent effort to ward off deer, someone had strung fishing line around several of the plots and hung chemical soaked rags on the line.

The critical question that this case poses is whether the police had probable cause to believe that the defendants were the people cultivating the marijuana. The information implicating the defendants in cultivation at the point of the felony stop was: a luggage tag with the name of Tim Gulick found in the garden; King's pickup truck parked at Gulick's residence; King's long, light-colored hair; tape from the surveillance camera showing two men, one with long light hair, shining flashlights on the garden; King's pickup truck seen in the parking area at Roche Gulch on the night of arrest; and two men, one carrying a backpack and the other with long hair and a dog, seen walking out of

the canyon and leaving in King's pickup truck.

While this evidence merits the suspicion that King and Gulick had visited the garden, these facts do not specifically tie either to the crime of cultivation of marijuana. For example, the police did not find footprints or tire tracks in the garden tying the defendants to the scene. *See People v. Hazelhurst,* 662 P.2d 1081, 1087 (Colo.1983) (holding that there was probable cause to arrest defendant Hazelhurst for cultivation of marijuana where, among other things, footprints and tire tracks connected Hazelhurst to the marijuana farms). The police lacked information at the time of arrest that either defendant possessed cultivation tools linking them to the garden. *Cf. id.* (noting that tools found in a cache at the marijuana farm in Montezuma County had markings indicating that they had been purchased in Grand Junction where Hazelhurst was living and that, before arresting Hazelhurst, the police noticed that some of the items in his truck, such as planting boxes and farming equipment, matched items found in the cache). The police did not see the defendants cultivating marijuana. *Cf. People v. Boff,* 766 P.2d 646, 647 (Colo. 1988) (concluding that defendant was properly arrested for cultivation of marijuana after police surveillance team watched him water marijuana plants). While the police did notice that one of the suspects, like King, had long, light-colored hair, this information is too general to meet probable cause standards. "The touchstone supporting police action is the specificity of the information upon which they act." *Hazelhurst,* 662 P.2d at 1084–85.

Two of our recent cases illustrate the amount of specificity needed to establish the existence of probable cause to arrest. In *People v. Lewis,* the arresting officer saw a person whose general description—a tall black man wearing dark clothing—was consistent with that of a robber. 975 P.2d 160, 167 (Colo.1999). We held this general description, even when viewed in light of other circumstances such as the lateness of the hour, the absence of other people from the vicinity, and furtive gestures by the suspect's companion, did not give rise to probable cause. *Id.* at 168.

In *McCoy,* we did not need to reach the question of whether there was probable cause to believe the defendant in that case had committed or was committing a crime, because we concluded that the police lacked probable cause to believe that a crime had been or was being committed. *See* 870 P.2d at 1238. Nonetheless, we did discuss the two descriptions—one general, and one specific— provided by witnesses in that case. *See id.* at 1237–38. The first witness's description was of a "short, stout, black male about twenty-five years old." *Id.* at 1233. A day later, a second witness gave a similar description of a man "rather stocky and about twenty-five years old" but also noted that the man was wearing a black jacket with the name "McCoy" on it, that the jacket had a red devil on the back, that the man was wearing a large amount of jewelry and carrying a little bag, that he was accompanied by a woman in her twenties wearing a red jacket, and that the couple walked down the block towards a Burger King. *Id.* at 1234. We noted that the specificity of the description given by the second witness, combined with other information in the case, provided probable cause to believe the man the police arrested was the same person seen by the witness. *Id.* at 1237. As for the description given by the first witness, we said the question of probable cause was "much more problematic because of the generality of the [witness's] description." *Id.*

In the present case, the only distinguishing feature of the two men seen shining flashlights in the garden was that one of them had long light hair. This is a much more general description than those given in either *Lewis* or *McCoy* and, as in *Lewis,* even when combined with other factors in this case—the lateness of the hour and the remote location—falls short of the information needed to establish probable cause.

Even if the officers' descriptions had been more specific, there would still not exist a sufficient nexus to connect the two men to the crime of cultivating marijuana. In such a case, there might be probable cause to believe the men seen leaving the canyon were

the same men caught on tape the day before shining flashlights in the garden. However, evidence that a person visited a marijuana garden is not the same as evidence that such person cultivated marijuana there. Like the hunters who first reported the existence of the garden to the U.S. Forest Service Investigator, the men seen shining lights might have stumbled upon the garden while hunting or hiking in the canyon.

Without any information to tie the men to the act of cultivation, such as the observation in *Boff* of the suspect actually watering marijuana plants, we conclude that there existed an insufficient nexus for the police to believe that the defendants were responsible for cultivating the marijuana and thus at the point of arrest the police lacked probable cause. *See Boff,* 766 P.2d at 647.

### C.

■ Having determined that the police lacked probable cause, we turn to whether this encounter constitutes an investigatory stop, which, under the circumstances, necessitated the show of force used here. Initially, we note that police possessed reasonable suspicion to conduct an investigatory stop of the defendants.

The People argue that, although the encounter appears to be an arrest or a "seizure[ ] that resemble[s] formal arrest[ ]," *Perdue,* 8 F.3d at 1461, the force used by the officers to effectuate that investigatory stop was, under the circumstances, a reasonable precaution for their safety. We are not persuaded.

As discussed, an encounter in which police use force normally associated with an arrest may not always be deemed an arrest. If the prosecution can establish the existence of specific facts or circumstances that render the degree of force used a reasonable precaution for the protection and safety of the investigating officers, then the encounter may be characterized as an investigatory stop rather than an arrest.

As part of our analysis of when applied force may accompany an investigative stop, we find helpful a discussion of two recent cases, *Smith, supra,* and *Garcia, supra,* in which we held that force used by the police was within the bounds of an investigatory stop. Contrasting the facts of these cases with the facts here leads us to conclude that the facts and circumstances in this case do not support the degree of force employed.

In *Smith,* we held that the officers' drawing of guns and use of handcuffs during a traffic stop did not escalate the encounter into an arrest because the force used "was not unreasonable in light of the circumstances the officers faced." 13 P.3d at 303. A variety of circumstances specific to that case—that the events occurred at 3:00 a.m., that no one else was on the highway at that time, that the investigating officer determined that the vehicle was stolen, that the suspect had placed a phone call from her car during the stop, and that after the call was made a large SUV pulled up directly behind the police car and left its headlights on so that the investigating officer could not see behind him—made the force used a reasonable precaution for the officers' safety. *Id.* at 306.

In *Garcia,* we determined that detaining the defendant in a police car for fifteen minutes during the course of an investigatory stop regarding a nighttime domestic disturbance involving drugs did not constitute an arrest. 11 P.3d at 451. Some of the specific circumstances that made that detention permissible were: when the officers arrived, a heavily intoxicated man was yelling and knocking on the door of the residence; as officers spoke with the defendant in his doorway, police noticed a crack pipe on the ground and a picture of a marijuana plant on the wall inside the residence; and additional people were leaving the residence. *Id.* at 451-2. We concluded that, under these circumstances, temporarily placing the defendant without handcuffs in the back of a squad car was a reasonable precaution for the officers' safety. *Id.* at 456.

In the present case, the testimony of both police officers failed to establish any specific facts or circumstances indicating that the two men stopped in the Nissan pickup posed a danger that would cause a reasonable police officer to resort to the force used. Agent Buffington testified that there was no evi-

dence either man was carrying a weapon, nor was there any evidence that either man would use a weapon. *Cf. In re D.F.*, 933 P.2d 9, 11 (Colo.1997) (holding that it was within the bounds of an investigatory stop for police, in responding to a tip that a juvenile matching one of the suspects' descriptions was carrying a gun, and observing that one of the suspects was walking stiff-legged as if he were carrying a weapon in his pants, to drive their police car onto the lawn in front of juveniles, exit the car, and order the juveniles to put their hands in the air). Possible accomplices did not, as in *Smith,* arrive at the scene and blind the officers with their headlights. 13 P.3d at 303. There is no evidence that the defendants acted furtively or sought to evade the police. *Cf. Archuleta,* 980 P.2d at 511 (holding that, in an investigatory stop case, after officer approached three men in an alley behind a bar, one man "took off running," ran all the way around the block, knocked over a bicyclist, and hid under some tables in the bar, officer's actions in chasing the man and then approaching him in the bar with his gun drawn did not offend the Fourth Amendment).

We are not persuaded by the People's argument that the force used by the police in this case was a reasonable precaution for the safety of the officers because the stop occurred in an isolated area where radio contact was difficult, and the officers' training indicated that persons who cultivate marijuana may be armed and dangerous. This information fails to communicate any specific facts or circumstances suggesting that either defendant would fail to cooperate with the request to stop or would be dangerous. Standing alone this general information does not justify the degree of force employed here.

To hold that the degree of force used was within the limits of an investigatory stop would render the distinction between an investigatory stop and arrest meaningless and attenuate the standard of probable cause below that which is mandated by the Colorado and U.S. Constitutions. Hence, we hold that when the police pulled the defendants over, ordered them at gunpoint out of the pickup and onto the ground and handcuffed them, the encounter between the police and the defendants constituted an arrest and not an investigatory stop. Having found that there was not probable cause to arrest, we hold that the defendants were illegally arrested and thus all evidence procured incident to that arrest must be suppressed.

### III. CONCLUSION

Accordingly, we affirm the trial court's suppression orders in both cases and remand the cases to that court for further proceedings consistent with this opinion.

JUSTICE COATS, dissenting.

In these two cases, the court finds that police officers were not justified in physically restraining, with handcuffs and drawn guns, two suspects whose car they stopped while driving away, at night, from a box canyon in which a substantial cultivation of marijuana was being kept under surveillance. The court holds first, that the police lacked probable cause to support an arrest and second, that the use of such force exceeded the limits of an investigatory stop. Because I disagree on both counts, I respectfully dissent.

Since warrants are not constitutionally required for seizures of the person outside the home, even an arrest of the defendants would have been justified by probable cause. *United States v. Watson,* 423 U.S. 411, 423, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Probable cause to arrest exists when the facts and circumstances known to the arresting officer are sufficient to warrant the belief by a reasonable and prudent person, in light of that person's training and experience, that an offense has been committed and the defendant committed it. *People v. MacCallum,* 925 P.2d 758, 762 (Colo.1996); *People v. Thompson,* 793 P.2d 1173, 1175 (Colo.1990); *Banks v. People,* 696 P.2d 293, 296 (Colo. 1985); *see also United States v. Ventresca,* 380 U.S. 102, 108–09, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and probable cause involves probabilities similar to the factual and practical questions of everyday life upon which reasonable and prudent persons act. *MacCallum,* 925 P.2d at 762; *Thompson,* 793 P.2d at 1175; *Banks,* 696 P.2d at 296. Prob-

able cause is clearly a matter of common sense, not mathematical probability. *Banks,* 696 P.2d at 296; *see also Dunaway v. New York,* 442 U.S. 200, 213, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

Probable cause is also an objective standard. *People v. Gouker,* 665 P.2d 113, 117 (Colo.1983); *see also* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.2(b) (3d ed. 1996 & Supp.2001). It includes an exploration into the totality of the circumstances known to the officers at the time of the arrest, *MacCallum,* 925 P.2d at 762; *People v. Washington,* 865 P.2d 145, 147 (Colo.1994), but the existence of probable cause does not depend upon the subjective conclusions of the officer. *See Florida v. Royer,* 460 U.S. 491, 507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (officer's belief that he lacked probable cause for an arrest does not prevent the court from later finding probable cause); *Gouker,* 665 P.2d at 117; *see also* LaFave, *supra.* While determining what was known to the police is largely a matter of historical fact subject to a clear error standard of review, the ultimate determination whether that information amounts to probable cause or reasonable suspicion is treated as a question of law, subject to de novo review. *Trinidad Sch. Dist. No. 1 v. Lopez,* 963 P.2d 1095, 1103 (Colo.1998) (citing *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

With regard to the crime itself, the police not only had probable cause to believe that illegal cultivation of marijuana was being committed; they were virtually certain of it. Unlike situations in which the police are forced to rely on reports of questionable reliability, here the police had first-hand knowledge of the crime. They had witnessed the systematic cultivation of marijuana, divided into as many as eleven separate plots, containing more than 200 separate plants. While viewing the fields themselves was overwhelming evidence of the deliberate cultivation of marijuana, in addition, through videotape surveillance cameras they had actually witnessed two men, tending the individual plants, at night by flashlight.[1] As to the commission of a crime, therefore, there could be no serious doubt.

With regard to the involvement of the defendants in the crime, the police investigation had also discovered information amounting to probable cause. This was not a case of an arrest based on a general description. Attention had focused on the defendants well before the night they were arrested. The police had discovered an airline luggage tag bearing the name of defendant Gulick among the plots of marijuana while stationing a surveillance camera and had subsequently identified Gulick's current address through the telephone directory. The officers had already learned about defendant King's blue Nissan truck, and Officers Buffington and Bennett had actually spoken with King at Gulick's residence, with the vehicle parked in front. Furthermore, the officers had viewed a surveillance-camera videotape showing two men, one of whom had long, light-colored hair, moving among the marijuana plants at night with flashlights.

When Agent Bennett watched the two men, who had the physical characteristics of Gulick and King, including long, light-colored hair on one of them, emerge from the canyon

---

1. In its order, the district court makes a finding of fact that on September 19th two officers set up a new surveillance camera and retrieved a prior recorded videotape. This reference to September 19th was apparently inadvertent because it was completely unsupported by any evidence in the record and was clearly erroneous. The uncontested testimony of the officers indicated that three tapes had actually been retrieved from two different surveillance cameras. The first tape, retrieved from the first camera installed to record vehicle traffic, was retrieved on September 16th and revealed no evidence, as the camera was not working. This tape was not admitted into evidence. The second tape was retrieved and viewed on the morning of September 20th, prior to any live surveillance of the marijuana plots. This tape came from the camera set up in the marijuana plots, and revealed two individuals, whom the officers identified as males, inspecting the marijuana plants by flashlight in the evening. Defense counsel himself acknowledged that the police had knowledge of the contents of this video recording prior to stopping the defendants. Finally, the third tape, which actually provided facial identification of both defendants, was retrieved and viewed on the 21st, after both defendants had been arrested. Both the second and the third tapes were admitted into evidence.

at night with flashlights and get into the blue Nissan truck that he already knew belonged to King, only the most minimal logical inferences were required for him to believe that the two men were Gulick and King; that they had returned to the marijuana plots at night when they were not likely to be seen; and therefore that they were involved in the cultivation of the marijuana. Besides the relatively limited number of innocent explanations for anyone's presence at that location under those circumstances, these inferences were supported by Bennett's awareness that Gulick (or at least his name tag) previously had been physically present among the marijuana plants; that Gulick had a very recent friendship or association with King; and that sometime within the prior three nights, two men, who from general appearances could well have been Gulick and King, had been shining flashlights among the marijuana plants at night. This evidence was not only sufficient to cause reasonable and prudent people to act on the belief that the defendants were involved in the marijuana cultivation; it was powerful circumstantial evidence of their guilt.

To establish a link between the defendants and the crime sufficient to justify an arrest, the majority would require not only direct evidence of their presence in the marijuana fields but also additional evidence to prove their intent and rebut potential defenses they might raise. *See* maj. op. at ——––——. Probable cause to arrest does not mean proof sufficient to convict. *People v. Washington,* 865 P.2d 145, 148 (Colo.1994). It does not even require the absence of innocent explanations for the conduct. LaFave, *supra,* § 3.2(e) at 69–70 ("The mere fact that 'innocent explanations for the activity may be imagined' is not enough to defeat the probable cause showing, and there is probable cause if a 'succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one.'") (citations omitted); *see also People v. Altman,* 960 P.2d 1164, 1171 (Colo.1998). It is a practical, nontechnical conception, measured by reasonableness, that represents a necessary accommodation between the individual's right

to liberty and the State's duty to control crime. *Gerstein v. Pugh,* 420 U.S. 103, 111–12, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *People v. Rayford,* 725 P.2d 1142, 1146 (Colo. 1986). The holding in this case appears to require not only sufficient evidence to reach a jury but virtual certainty of conviction before an initial arrest can be made.

However, even if these circumstances could be legally characterized as amounting to no more than reasonable suspicion, rather than as probable cause, I would find that the actions of the police did not exceed those reasonably designed to protect their safety during the seizure. Although the Supreme Court has never spelled out the precise characteristics that distinguish an investigatory stop from an arrest, "[t]he trend developing since *Terry* has been to include within the rubric of investigatory stops in some circumstances 'the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.'" *People v. Archuleta,* 980 P.2d 509, 513 (Colo.1999) (citations omitted).

Today the court holds that "when officers use force typically associated with an arrest—such as the drawing of weapons, physical restraint, and the use of handcuffs—the encounter may be characterized as an investigatory stop only when specific facts or circumstances exist that render the use of such force a reasonable precaution for the protection and safety of the officers." Maj. op. at ——. If this holding were intended to suggest that police officers must have information that the suspect is armed at the time of the stop, or has been armed in similar situations in the past, it would be a substantial departure from existing precedent. *See Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (an officer is entitled to draw reasonable inferences, in light of his training and experience, in deciding to conduct a pat-down for weapons during a stop); *see also Archuleta,* 980 P.2d at 513–514 (approving drawn gun during investigatory stop on grounds that unknown person had fled from approaching officer and might be hiding in dark room). Among the most common

grounds for taking protective action in executing a stop are the nature and seriousness of the crime of which the person being stopped is suspected. *See People v. Hughes,* 767 P.2d 1201, 1205 (Colo.1989) (citing *United States v. Trullo,* 809 F.2d 108 (1st Cir. 1987), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987), and recognizing that "firearms are tools of the trade" in the drug world, justifying extra precautionary measures to ensure police safety); *see also United States v. Holt,* 229 F.3d 931, 938 (10th Cir.2000) (recognizing that officer's limited knowledge that individual was suspected of drug trafficking could provide reasonable suspicion that suspect was armed and dangerous.); *United States v. Diaz–Lizaraza,* 981 F.2d 1216, 1221 (11th Cir.1993) (acknowledging that drug dealing is known to be extremely violent, and holding that stop of suspected drug dealers did not become arrest merely because agents drew their guns); *United States v. Sinclair,* 983 F.2d 598, 602–03 (4th Cir.1993) (proper for police to draw guns incident to investigatory stop of suspected drug dealers), *United States v. Ocampo,* 890 F.2d 1363, 1369 (7th Cir.1989) (same); *United States v. Nargi,* 732 F.2d 1102, 1106 (2d Cir.1984) (investigatory stop with guns drawn was reasonable where officers suspected large-scale marijuana trafficking, a type of crime known to often involve weapons, individual matched general description of known suspect, and stop was conducted at night, in isolated area).

Here, although the police had no report that the suspects were currently armed and dangerous or that they had prior gun-related convictions, neither did the police act merely on general suspicions that the suspects might be engaged in some kind of criminal activity. The police had positive, first-hand knowledge that a serious drug felony was being committed in the canyon. At the time of the seizure, they not only had grounds to suspect the defendants of committing that offense but in light of the timing and location of the seizure, they also knew that the suspects would know the reason they were being stopped, possibly with incriminating evidence in the car and on their persons. In addition to the darkness and secluded nature of the area and the notorious dangerousness of approaching a stopped vehicle, *see United States v. Stanfield,* 109 F.3d 976, 978 (4th Cir.1997); *United States v. Packer,* 15 F.3d 654, 657 n. 2 (7th Cir.1994); *Hampe v. Tipton,* 899 P.2d 325, 331 (Colo.App.1995), the officers knew that they were stopping men for a crime punishable by substantial prison sentences and involving the loss of substantial amounts of money. Under these particular circumstances, the officers had every reason to anticipate that they would encounter armed resistance.

The primary, if not sole, purpose of the Fourth Amendment exclusionary rule is to modify or deter undesirable behavior of executive branch officers. *United States v. Leon,* 468 U.S. 897, 916 (1984); *see also People v. Deitchman,* 695 P.2d 1146, 1152 (Colo.1985)(Erickson, C.J., concurring). Suppressing evidence as the result of an illegal stop necessarily implies that the police should have acted differently. Given the strength of the evidence and the seriousness of the offense being committed in this case, I would not require the officers either to let the suspects go without even attempting a stop, or require them to approach the suspects' car without taking protective action for their own safety. Limited protective action upon initial contact, while more intrusive, does not change the time of detention, movement, or search limitations imposed upon investigatory stops or fundamentally erode the distinction between a stop and an arrest.

Because I do not believe the seizure of the defendants violated the Fourth Amendment's prohibition against unreasonable seizures, I would reverse the suppression order of the district court.

I am authorized to state that JUSTICE RICE joins in this dissent.

Justice COATS dissents, and Justice RICE joins in the dissent.