The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Eric Russell BRAZZEL, Defendant–Appellee.

No. 00SA308.

Supreme Court of Colorado, En Banc.

March 12, 2001.

A.M. Dominguez, Jr., District Attorney, Susan D. Knox, Deputy District Attorney, Greeley, CO., Attorneys for Plaintiff–Appellant.

Michael A. Varallo, Greeley, CO, Attorney for Defendant–Appellee.

Justice HOBBS delivered the Opinion of the Court.

In this interlocutory appeal brought pursuant to C.A.R. 4.1 and section 16–12–102(2), 6 C.R.S. (2000), we review the trial court's suppression of evidence obtained in a search of defendant's apartment after he was arrested for possession of marijuana. The trial court determined that the police officers should have obtained a search warrant before searching defendant's home after he was arrested; therefore, it held that the methamphetamine the officers found in that search must be suppressed. The prosecution contends in this appeal that the defendant voluntarily consented to the second search, and that the trial court erred in suppressing the evidence for lack of a search warrant. Because the trial court erred in holding that a warrant is required when one can "easily" be obtained and it made no findings on the issue of voluntary consent, we reverse the trial court's suppression order and remand the case for additional factual findings and conclusions of law.

I.

At approximately 11:00 p.m. on February 15, 2000, while in pursuit of shoplifting suspects, two police officers arrived at the apartment of defendant Eric Russell Brazzel in Greeley. Upon arriving, the officers knocked on Brazzel's door, and he greeted them from behind a screen door. The officers asked Brazzel if he was involved in the shoplifting. Brazzel responded that he had driven two friends to the store earlier that evening, but had no idea they were going to steal anything.

The officers then asked Brazzel if they could come inside the apartment to look for

the two suspects. Brazzel responded that he would prefer that the officers not enter his home and reiterated that the suspects were not inside. After more conversation, Brazzel stepped outside at the officers' request.

At the suppression hearing, the two sides presented differing versions of the events that occurred. We recite each version in turn. Brazzel testified that he answered the door and immediately refused to let the officers into his home. He spoke with the two officers from behind his screen door for about five minutes, at which time, after some "bickering back and forth," he finally stepped outside to talk to the officers. Though it was winter, "very cold," and approaching midnight, he was wearing shorts and a tee shirt and was barefoot. Upon stepping outside, the officers immediately handcuffed him and questioned him extensively about the events surrounding the shoplifting. He was outside for twenty to thirty minutes, during which time he told the officers the first name of one suspect, and the first and last name of the other suspect. He repeatedly told the officers that he had sent the two thieves on their way when he learned what they had done, and they were not hiding inside his apartment. Although the officers said he was not a suspect in the shoplifting, Brazzel felt pressured to let the officers in. The officers acted indignant, as if they thought he was lying about the incident. According to Brazzel, the officers' "tone and ... wording" made him feel threatened and humiliated by the entire experience. After feeling as though he would "freeze to death," he gave in to a search of his apartment for the two shoplifting suspects. Brazzel described the search as a general rummage through his personal effects.

Brazzel was also in poor health:

Q: Do you have health problems?

A: It's generally pretty poor. I don't eat. I suffer from malnutrition. I have a mental illness. I am a manic depres-sive, go from very cooperative, to very angry, to very depressed, rapid mood changes. I cannot afford medicine for it.

The testimony of the officers was that two of them approached Brazzel's apartment door and asked to come inside. Upon Brazzel's refusal, one officer asked him to step outside, which he did immediately. After discussing the theft outside for about five minutes, Brazzel consented to a search of his apartment for the two suspects. During the search, the officers came across two baggies of suspected marijuana and some drug paraphernalia in plain view.[1] At that point, they arrested Brazzel and handcuffed him.[2] Shortly thereafter, additional backup officers arrived on the scene.

One of the newly arrived officers testified that he took Brazzel outside to obtain his consent to search the apartment for narcotics. The officer tried to calm Brazzel down and to explain that the officers wanted to conduct a second search. The officer gave Brazzel a blanket or jacket to wear because of the cold weather. According to the officer, Brazzel thereafter gave no indication that he did not want the officers to search, but merely stated his understanding of what the officers wanted, and consented to the search. The officer testified that he in no way tried to intimidate Brazzel, did not draw a weapon, and only tried to calm Brazzel down and help him understand what was happening. Upon reentering the apartment, Brazzel sat down on a chair, and an officer immediately read him his *Miranda* rights. The officers did not elicit a written consent to search for narcotics from Brazzel or tape record the oral consent.

Brazzel stated that, while the backup officer "never threatened [him] in any way," he did not voluntarily consent to the second search, and the officer had lied about giving him a *Miranda* warning.

1. Although Brazzel testified at the hearing that the officers conducted their search in areas not constituting "plain view," he has conceded that the marijuana was in plain view.

2. This contradicts Brazzel's testimony. Brazzel testified that he was handcuffed upon going outside to talk with the officers before the first search. Both sides agree that Brazzel was handcuffed, at the latest, after his arrest.

According to the officers, the backup officer reentered the apartment with Brazzel and announced to the other officers that Brazzel had consented to a second search. In consenting to the second search, Brazzel said "you're going to find the shit anyway, so I might as well cooperate." During the second search of the apartment, the officers found more paraphernalia in a closet, as well as two "bindles" of methamphetamine in a box near Brazzel's bed. The prosecution charged Brazzel with one count of possession of a Schedule II controlled substance (methamphetamine), a class 4 felony,[3] and one count of possession of more than one ounce but less than eight ounces of marijuana, a class 1 misdemeanor.[4]

Brazzel maintained that he had not voluntarily consented to either search and challenged both for lacking warrants. At the close of the suppression hearing, the trial court ruled that: (1) Brazzel had voluntarily consented to the first search of his apartment for the shoplifting suspects; and (2) the officers should have obtained a warrant for the second search. The trial judge stated that:

> [I]t would have been very very easy, and should have been done by the officers, to ... place Mr. Brazzel into custody, transport him to the police department, ... until they're able to obtain a search warrant to search at greater length. They didn't do that. I'm not going to admit the methamphetamine that was seized.

The court admitted the marijuana and paraphernalia from the first search into evidence, and suppressed the methamphetamine and additional paraphernalia discovered in the second search.

The prosecution here argues that the second search was consensual, and that the trial court erred in finding the search illegal because it would have been "easy" for the police to have obtained a warrant. Brazzel argues that he did not voluntarily consent to the second search. We agree with the prosecution that the officers did not need to obtain a search warrant if Brazzel voluntarily consented to the second search. However, we are unable to determine from the record whether or not Brazzel voluntarily consented to the second search, an issue both sides present to us in their briefs, because the trial court made no factual findings regarding this issue.

## II.

We hold that the trial court erred in ruling that, since it would have been "easy" to obtain a warrant, the police should have obtained one; instead, the court should have determined whether Brazzel voluntarily consented to the second search. We therefore reverse the trial court's suppression ruling and return the case for completion of the suppression proceedings, namely for findings of fact and conclusions of law on the issue of Brazzel's alleged voluntary consent to the second search. In doing so, we note the unusual status of the record in regard to our review of this case. In the suppression hearing and here, the prosecution raised the issue of Brazzel's voluntary consent to the second search. The prosecution bears the burden of proof on this issue. The court ruled that the first consent was voluntary, but it did not make findings regarding the second allegedly voluntary consent. The court should have proceeded to resolve this issue.

### A. The Trial Court's Suppression Proceedings

It was the trial court's role to determine the factual issues presented by a motion to suppress, and this in turn required the trial judge to make findings of fact when ruling on a motion to suppress. *People v. King,* 16 P.3d 807, 812 (Colo.2001); *People v. Pitts,* 13 P.3d 1218, 1221 (Colo.2000); *People v. Mendoza–Balderama,* 981 P.2d 150, 157 (Colo.1999); *People v. Welsch,* 740 P.2d 524, 526 (Colo.1987); *People v. Martinez,* 185 Colo. 278, 279–80, 523 P.2d 1405, 1406 (1974); *People v. Duncan,* 176 Colo. 427, 428, 498 P.2d 941, 942 (1971). It is the function of the trial court and not the reviewing court to weigh the evidence and determine the credibility of the witnesses. *Mendoza–Baldera-*

---

**3.** §§ 18–18–204(2)(c)(II), –405(1)(a), (2)(a)(I), 6 C.R.S. (2000).

**4.** § 18–18–406(4)(a)(I), 6 C.R.S. (2000).

*ma*, 981 P.2d at 157. The trial court must then analyze the facts established by the evidence and enter its legal conclusions. *King*, 16 P.3d at 812; *People v. Hoinville*, 191 Colo. 357, 360, 553 P.2d 777, 780 (1976).

■ The law of consensual searches is well developed.[5] The voluntariness of a consent to search necessarily involves, first, a question of historical fact that the trial court must determine. *People v. Reddersen*, 992 P.2d 1176, 1182 (Colo.2000). The trial court must examine the totality of the circumstances and then enter its conclusions of law based thereon. *People v. Licea*, 918 P.2d 1109, 1113 (Colo.1996); *People v. Carlson*, 677 P.2d 310, 318 (Colo.1984).

Here, it is unclear whether the trial court's findings regarding credibility in reference to consent to the first search would also lead it to the conclusion that Brazzel had voluntarily consented to the second search. The trial court specifically noted that, to accept as correct what Brazzel asserted, it must have found Brazzel's testimony more credible than the police officers'. The trial court found that it could not believe Brazzel over the officers and, consequently, it found Brazzel's consent to the first search to be valid.

■ Voluntary consent to search obviates the necessity of a warrant. "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854, 858 (1973); *see also People v. Cascio*, 932 P.2d 1381, 1389 (Colo.1997). However, in regard to the second warrantless search, the trial court did not address the issue of voluntary consent. Instead, the court ruled that it would have been "easy" for the officers to have obtained a warrant; therefore, they should have obtained one. This was error because the prosecution put voluntary consent at issue, and because the Fourth Amendment does not require a warrant,

whether or not it would be easy to obtain one, when the defendant voluntarily consents to the search.

### B. Our Review in Light of the Record

We review suppression appeals under C.A.R. 4.1, and section 16–12–102(2). See *King*, 16 P.3d at 812 (stating that "[a]n appellate court ... has the responsibility to ascertain whether the trial court's legal conclusion[s] [are] supported by sufficient evidence and whether the trial court applied the correct legal standard"); *People v. D.F.*, 933 P.2d 9, 13–14 (Colo.1997) (stating that "[a]n ultimate conclusion of constitutional law that is inconsistent with, or unsupported by evidentiary findings ... is subject to correction by a reviewing court").

■ A court's findings of historical fact are entitled to deference by a reviewing court, and they will not be overturned unless unsupported by the record on appeal. *King*, 16 P.3d at 812; *People v. Winpigler*, 8 P.3d 439, 444 (Colo.1999). We defer to the trial court's findings of fact on the issue of voluntary consent, unless they are clearly erroneous. *See Reddersen*, 992 P.2d at 1182; *University of Colo. ex rel. Regents of the Univ. of Colo. v. Derdeyn*, 863 P.2d 929, 946 (Colo. 1993); *People v. Drake*, 785 P.2d 1257, 1266 (Colo.1990). Nevertheless, when the absence of factual findings regarding key contested issues hinders appellate review, or when unresolved evidentiary conflicts exist with regard to material facts, we remand the case to the trial court for further fact-finding. *N.A.H. v. S.L.S.*, 9 P.3d 354, 366 n. 13 (Colo. 2000); *D.F.*, 933 P.2d at 14.

■ Because the trial court did not make any findings of fact regarding key evidentiary issues relating to the alleged voluntary consent to the second search, we are unable to apply the law of consensual searches to the facts of this case, despite briefing by both parties regarding the law of voluntary con-

---

5. For an overview of the law of consensual searches in Colorado, see *People v. Reddersen,* 992 P.2d 1176, 1181–83 (Colo.2000).

sent. We therefore reverse the trial court's suppression order.

## III.

Accordingly, we reverse the trial court's suppression order and remand the case for further proceedings consistent with this opinion.