The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
October 29, 2020

## 2020COA150

## No. 17CA1127, *People v. Oliver* — Constitutional Law — Fourth Amendment — Searches and Seizures — Investigatory Stops

A division of the court of appeals concludes that, when
detaining an individual fleeing from the scene of a shooting, the
officer's handcuffing of the individual and placing him in the back
of the patrol car were appropriate measures taken for officer safety
and thus did not convert the contact from a valid investigatory
detention into an arrest.  However, the division further concludes,
for the first time, that the continued use of such restraints after the
officer safety concerns were dispelled was improper, and the stop
became an arrest that was not supported by probable cause.
Because the evidence obtained after the arrest should have been
suppressed, and the failure to do so was not harmless beyond a
reasonable doubt, the division reverses the defendant's convictions

for first degree murder and first degree assault.  However, the division rejects the defendant's contention that there was insufficient evidence of intent and deliberation and thus remands for a new trial on the original charges.

COLORADO COURT OF APPEALS                                              **2020COA150**

Court of Appeals No. 17CA1127
City and County of Denver District Court No. 15CR5059
Honorable Kandace C. Gerdes, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jesse L. Oliver,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE TOW
Navarro and Lipinsky, JJ., concur

Announced October 29, 2020

Philip J. Weiser, Attorney General, Katharine Gillespie, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Stephen Arvin, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Jesse L. Oliver, appeals his judgment of conviction entered on jury verdicts finding him guilty of first degree murder and first degree assault.  We conclude that the investigatory stop of Oliver became an arrest when officers failed to remove his handcuffs after officer safety concerns were dispelled and the officers ascertained Oliver's identity.  Because the officers did not have probable cause at that time, the arrest was unconstitutional.  Further, because we cannot conclude beyond a reasonable doubt that there is no reasonable possibility that evidence obtained as a result of this unlawful arrest contributed to the verdicts, we reverse the judgment and remand the case for a new trial.  We also direct the trial court to determine whether one witness's in-court identification was sufficiently supported by the witness's independent recollection or, instead, whether it was tainted by the show-up proceeding that itself was a fruit of the unlawful arrest.

## I.     Background

¶ 2     According to the evidence presented at trial, when A.Q. — one of the victims in this case — and four others arrived at an apartment complex, they encountered three men they did not recognize.  One of the men, later identified by members of A.Q.'s

1

group as Oliver, asked "what's bracking," a question that came across as aggressive.[1]

¶ 3    Soon after, B.B., a resident at the complex, went out to his car in the parking lot. As he left his car and began walking back towards his apartment, the man witnesses identified as Oliver walked up to B.B. and fired approximately six bullets at him. Two of the bullets struck B.B., killing him, while another bullet hit A.Q. as she stood on the apartment stairs, paralyzing her. A nearby police officer saw Oliver running from the area and apprehended him.

¶ 4    A jury convicted Oliver of first degree murder and first degree assault. He was sentenced to life plus a consecutive thirty-two years in the custody of the Department of Corrections.

## II.    Sufficiency of the Evidence

¶ 5    Oliver first contends that there was insufficient evidence of intent and deliberation to support his conviction for first degree murder. He also asserts that there was insufficient evidence that he had the intent to commit first degree assault. We disagree.

---

[1] The prosecution offered no evidence at trial regarding the meaning of "bracking."

## A. Standard of Review

¶ 6    When evaluating a claim of insufficient evidence, we review the record de novo to determine whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is "sufficient both in quantity and quality" to support the conviction beyond a reasonable doubt. *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). We give the prosecution the benefit of every reasonable inference that may be drawn from the evidence. *People v. Perez*, 2016 CO 12, ¶ 32. A conviction will not be set aside merely "because a different conclusion might be drawn from the evidence." *People v. Tumbarello*, 623 P.2d 46, 49 (Colo. 1981).

## B. Additional Facts

¶ 7    The jury heard testimony that Oliver and two other men appeared angry and aggressive several minutes before the shooting. A witness testified that, as she watched B.B. walking away from his car and back to his apartment, she saw Oliver walk "up to [B.B.]'s car." "He walked up to the driver's side in the back," while B.B. stood alone by "the top of his car on the driver's side." When B.B. turned around towards Oliver, Oliver "started shooting him."

3

Standing six feet away, he fired approximately six shots at B.B. and then ran away. Other than firing the gun, Oliver did not move as he shot at B.B. Prior to the shooting, Oliver and B.B. did not speak to one another or interact in any way.

## C.  First Degree Murder

¶ 8    Section 18-3-102(1)(a), C.R.S. 2019, provides, "[a] person commits the crime of murder in the first degree if . . . [a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person or of another person." "A person acts 'intentionally' or 'with intent' when his conscious objective is to cause the specific result proscribed by the statute defining the offense." § 18-1-501(5), C.R.S. 2019.

¶ 9    As to intent, a juror could reasonably infer from the evidence that Oliver's conscious objective was to cause B.B.'s death when he fired multiple shots at him at close range. *See People v. Madson,* 638 P.2d 18, 26 (Colo. 1981) ("The circumstances surrounding the victim's death permit the reasonable inference that the defendant fired a pistol at close range into her skull in a manner clearly intended to cause death."). Therefore, the evidence was sufficient to support the element of intent.

¶ 10    Further, "[t]he term 'after deliberation' means not only intentionally but also that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act.  An act committed after deliberation is never one which has been committed in a hasty or impulsive manner."  § 18-3-101(3), C.R.S. 2019.  Deliberation requires that the decision to kill be made after "the exercise of reflection and judgment," but "the length of time required for deliberation need not be long."  *People v. Bartowsheski*, 661 P.2d 235, 242 (Colo. 1983).

¶ 11    Here, the witnesses testified that Oliver had been acting angrily and aggressively, had remained in or near the parking lot for as much as twenty minutes, approached B.B. as B.B. walked from his car toward the apartment building, and, once B.B. turned to face him, shot him multiple times.  Providing the prosecution with the benefit of every reasonable inference that might be drawn from this evidence, a fact finder could conclude that Oliver acted after reflection and judgment, rather than with haste and impulsiveness.  Thus, the evidence was sufficient to show he acted after deliberation.

¶ 12     Oliver argues that the People failed to establish either intent or deliberation because there was no evidence that he possessed animosity towards B.B. or otherwise had a motive to kill him. But Oliver's argument is unavailing. While often relevant, proof of motive is not necessary to prove the commission of a crime. *Wooley v. People*, 148 Colo. 392, 400-01, 367 P.2d 903, 907 (1961). The People did not need to prove why Oliver intentionally and deliberately killed B.B., only that he did so. Even without evidence of Oliver's motive, for the reasons we discussed above, a reasonable juror could look to the circumstances surrounding B.B.'s death and infer that Oliver acted with intent and after deliberation.

¶ 13     The evidence was therefore sufficient to support a finding of guilt beyond a reasonable doubt.

### D.     First Degree Assault

¶ 14     Oliver also argues that the evidence was insufficient to establish that he acted with intent when he injured A.Q. because, in his view, there is no evidence that he consciously sought to cause her serious bodily injury. Again, we disagree.

¶ 15     Under section 18-3-202(1)(a), C.R.S. 2019, a person commits first degree assault if "[w]ith intent to cause serious bodily injury to

6

another person, he causes serious bodily injury to any person by means of a deadly weapon." A jury may find that a defendant intended to cause injury to one person but actually caused injury to another. *People v. Whittiker*, 181 P.3d 264, 278 (Colo. App. 2006); *cf. People v. Jackson*, 2020 CO 75, ¶ 21 (holding that, because the language of the first degree murder statute references killing the intended victim or another person, the statute "deems the identity of the person harmed immaterial to the issue of intent"). Here, as discussed above, there was sufficient evidence that Oliver intended to cause B.B. serious bodily injury and, in attempting to do so, caused A.Q. serious bodily injury. Thus, the evidence presented was sufficient to support Oliver's conviction of first degree assault.

## III. Investigatory Stop and Arrest

¶ 16 Oliver next contends that Officer Joseph Guagliardo was not justified in stopping him and, even if any initial stop was justified, the stop eventually became an arrest unsupported by probable cause. Therefore, he argues, evidence obtained as a result of the stop should have been suppressed. We conclude that the initial stop was proper, but we agree that the stop transformed into an arrest unsupported by probable cause.

## A. Additional Facts

¶ 17    Officer Guagliardo was parked in his patrol car near the apartment complex when he heard gunshots. Moments after hearing the shots, he observed a man, later identified as Oliver, running from the complex parking lot. He pursued Oliver in his patrol vehicle. When he attempted to contact Oliver, Oliver proceeded to run faster. During this pursuit, Officer Guagliardo heard screams coming from the complex.

¶ 18    Eventually, Oliver stopped in a yard. Officer Guagliardo stepped out of his vehicle, held Oliver at gunpoint, instructed him to lie on his stomach, and waited until at least one cover officer arrived. Once cover arrived, Officer Guagliardo handcuffed Oliver, performed a pat-down search, and, finding no weapons, placed him in the back of his patrol car. This process took about two minutes. At this point, Officer Guagliardo asked Oliver for his name and date of birth, which Oliver provided.

¶ 19    Over thirty minutes later, gunshot residue (GSR) swabs of Oliver's hands were collected to be tested later at a crime laboratory. And approximately two hours after Officer Guagliardo apprehended Oliver, a witness, D.T., was brought to their location,

where he positively identified Oliver. During these two hours and during the show-up identification, Oliver remained handcuffed. The record indicates that, after stopping in the yard, Oliver was cooperative with police.

¶ 20 Oliver's identifying information was used to compile two photo arrays, which were shown to witnesses who identified Oliver from the arrays. Additionally, after Oliver was taken to the police station, officers conducted a second GSR test, which ultimately revealed the presence of gunshot residue on Oliver's shirt. Oliver filed a motion to suppress any evidence obtained as the result of the stop, which the trial court denied. The photo arrays, GSR results,[2] and testimony regarding D.T.'s show-up identification were all presented as evidence at trial. On appeal, Oliver argues that these pieces of evidence should have been suppressed.

## B. Standard of Review

¶ 21 A trial court's order regarding a motion to suppress involves "a mixed question of law and fact." *People v. Threlkel*, 2019 CO 18, ¶ 15 (quoting *People v. Gothard*, 185 P.3d 180, 183 (Colo. 2008)).

---

[2] The GSR test of Oliver's hands was negative. Only the positive test of the shirt is at issue in this case.

9

We defer to the trial court's findings of fact that are supported by competent evidence in the record, but review conclusions of law de novo. *People v. Allen*, 2019 CO 88, ¶ 13.

## C.  Governing Law and Analysis

¶ 22  Police-citizen interactions are classified as one of three types: consensual contacts, investigatory stops, or arrests. *People v. Archuleta*, 980 P.2d 509, 512 (Colo. 1999).  Neither party argues that the encounter between Oliver and officers was consensual. Therefore, we must evaluate whether the contact constituted an investigatory stop or an arrest.

¶ 23  An arrest requires probable cause that the person has committed, is committing, or is about to commit a crime. *People v. Pigford*, 17 P.3d 172, 175 (Colo. App. 2000).  An investigatory stop is constitutionally valid if three criteria are met: "(1) the officer must have a reasonable suspicion that criminal activity has occurred, is taking place, or is about to take place; (2) the purpose of the intrusion must be reasonable; and (3) the scope and character of the intrusion must be reasonably related to its purpose." *People v. Padgett*, 932 P.2d 810, 814-15 (Colo. 1997) (quoting *People v. Sutherland*, 886 P.2d 681, 686 (Colo. 1994)).

### 1. Reasonable Suspicion

¶ 24    Reasonable suspicion means that an officer has an articulable and specific basis in fact for suspecting that the individual is committing, has committed, or is about to commit a crime. *Id.* An officer is entitled to draw reasonable inferences from a person's conduct. *Threlkel,* ¶ 20.

¶ 25    Here, Officer Guagliardo heard multiple shots coming from an apartment complex and seconds later saw Oliver, and only Oliver, fleeing the area. When instructed to stop, Oliver ran faster. Officer Guagliardo heard screams coming from the complex. Based on the specific and articulable facts, in conjunction with the inferences drawn from the circumstances, it was reasonable for Officer Guagliardo to infer that a crime had been committed and that Oliver may have been involved.

### 2. Purpose of the Stop

¶ 26    Moreover, given what Officer Guagliardo had observed, it was reasonable for him to briefly stop Oliver to determine if Oliver had been involved in the criminal activity. *See People v. Contreras*, 780 P.2d 552, 555 (Colo. 1989).

11

### 3. Reasonableness of the Scope and Character of the Intrusion

¶ 27    In assessing whether the scope and character of the intrusion are reasonably related to its purpose, we may look to the use of force applied by officers. *People v. King*, 16 P.3d 807, 814 (Colo. 2001). The use of force or restraint, such as handcuffs, "increase[s] the degree of intrusion on an individual's privacy and liberty and 'heighten[s] our concern as to whether the action taken exceeds what is reasonably necessary.'" *Id.* (quoting *People v. Smith*, 13 P.3d 300, 305 (Colo. 2000)).

¶ 28    Nevertheless, the use of force does not automatically convert an investigatory detention into an arrest. Police officers may use reasonable measures to ensure their safety during an investigatory stop, but only if the use of such force is a reasonable precaution for the protection and safety of the officers. *People v. Wambolt*, 2018 COA 88, ¶ 84; *see also King*, 16 P.3d at 814. "If the People fail to prove that the use of force was necessary for officer safety, the encounter must be characterized as an arrest and, thus, must be supported by probable cause." *Wambolt*, ¶ 84; *see also King*, 16 P.3d at 817.

¶ 29    A division of this court has held that officers' decision to place suspects in handcuffs after determining they were not armed and were cooperative constituted an arrest because "no specific facts supported a reasonable belief that a threat to officer safety required the use of handcuffs and weapons." *Wambolt*, ¶ 87.

¶ 30    But, unlike the officers in *Wambolt*, Officer Guagliardo was justified in his initial use of force. He had heard gunshots, had seen Oliver running from the area of the shots, and knew Oliver had attempted to evade him. Thus, drawing his weapon until cover arrived was a reasonable measure to ensure his safety. Further, placing Oliver in handcuffs before performing the pat-down search was reasonable due to the distinct possibility that Oliver might be armed. It was also reasonable to leave Oliver in handcuffs while obtaining his identification until he could ascertain whether Oliver presented a danger due to having outstanding warrants. *See United States v. Shareef*, 100 F.3d 1491, 1507-08 (10th Cir. 1996) (holding that it was reasonable to hold unarmed suspects in handcuffs until confirming whether one was a wanted felon); *see also People v. Smith*, 926 P.2d 186, 189 (Colo. App. 1996) (holding that

ascertaining a detainee's identification is a valid purpose of an investigatory detention).

¶ 31    Thus, despite the use of force and handcuffs, the initial contact did not exceed the scope of its purpose.  This contact, therefore, was a proper investigatory detention.

¶ 32    However, once the officers had ensured that Oliver was unarmed and had ascertained his identification, they did not remove Oliver's handcuffs.  Instead, they left the handcuffs on for the entirety of the stop — approximately two hours.

¶ 33    While our supreme court has held that the use of handcuffs in an investigatory stop is justified only if necessary for officer safety, *Smith*, 13 P.3d at 305, Colorado case law does not specifically address whether the continued use of handcuffs is justified after an initial threat to officer safety has dissipated.  Several other jurisdictions have concluded that failing to remove handcuffs under similar circumstances is unreasonable and therefore elevates an investigatory detention to an arrest.  *See, e.g., Shareef*, 100 F.3d at 1507-08 (holding that, once confirmation was received that he was not a wanted felon, "the continued use of handcuffs constituted an unlawful arrest"); *United States v. Polanco*, No. 10 CR 627 RPP,

2011 WL 240140, at *8 (S.D.N.Y. Jan. 19, 2011) (unpublished opinion) (finding that, "the moment in which [the officer] did not remove [the defendant] from handcuffs after finding no weapons on his body, the stop was converted into a de facto arrest because the maximal intrusion of handcuffing, a hallmark of formal arrest, was no longer justified by 'legitimate safety concerns'"). *Cf. United States v. Salas-Garcia*, 698 F.3d 1242, 1252 (10th Cir. 2012) (finding that the fact that officers released the defendant from handcuffs as soon as they learned he was not a safety risk because he was unarmed and cooperating prevented the detention from becoming an unlawful arrest); *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (finding it appropriate to leave a defendant handcuffed because no female officer was available to search the defendant, and thus officers on scene were unable to determine if she was armed); *Reynolds v. State*, 592 So. 2d 1082, 1085 (Fla. 1992) (noting that "[a]bsent other threatening circumstances, once the pat-down reveals the absence of weapons the handcuffs should be removed"); *State v. Munson*, 594 N.W.2d 128, 137 (Minn. 1999) (concluding that officers acted reasonably when they handcuffed the occupants and frisked them for weapons, and then removed the

handcuffs once it was determined that the occupants were not armed).

¶ 34    We find the above authorities persuasive and equally applicable to the circumstances present here. Thus, we hold that where initially reasonable concerns regarding officer safety have been dispelled and the individual being detained has been identified, the continued use of handcuffs transforms an otherwise proper investigatory detention into an arrest.

¶ 35    Oliver's pat-down by officers revealed no weapons, he was outnumbered by police, his identification had been ascertained revealing no flight risk or safety concerns, and he was cooperating. Because officer safety concerns had been dispelled and no other threatening conditions existed, there was no basis for leaving the handcuffs on, and they should have been removed. Oliver's detention thus became an arrest.

¶ 36    The People concede that the earliest point at which probable cause existed was at 12:40 a.m. — approximately eighty-five minutes after the stop — once D.T. had provided a statement to the officers describing the man (fitting Oliver's description) he had seen at the scene carrying a gun. This was long after the detention had

16

developed into an arrest. Unsupported by probable cause, Oliver's arrest was unconstitutional.[3]

### 4. The Court Erred in Part by Denying the Motion to Suppress

¶ 37 Because the investigatory stop became an unlawful arrest when officers failed to remove Oliver's handcuffs after officer safety concerns had been dispelled and in the absence of other threatening conditions, we must next evaluate whether the trial court should have granted Oliver's motion to suppress the evidence obtained as a result of that stop and arrest. *See People v. Davis*, 903 P.2d 1, 4 (Colo. 1995) ("[E]vidence obtained as a result of an unlawful arrest must be suppressed.").

¶ 38 Oliver argues that the evidence of the (1) photo array identifications; (2) show-up identification; and (3) GSR was obtained as a result of the unlawful detention and, thus, should have been suppressed. We disagree that the photo arrays are "fruits of the poisonous tree," *see Wong Sun v. United States*, 371 U.S. 471, 488

---

[3] Nor does the fact that officers later developed probable cause cure the violation. Were that the rule, officers would be encouraged to detain someone as long as they could — even unconstitutionally — in the hope of ultimately developing probable cause to make the arrest they have already made.

(1963), but agree that the other evidence should have been suppressed.

¶ 39    First, the photo arrays were compiled using Oliver's identifying information, which, as noted above, was obtained during a proper investigatory stop.  Thus, neither the identifying information nor the lineups were derivative of an unlawful seizure.  The trial court, therefore, did not err by declining to suppress the arrays and evidence that witnesses had identified Oliver in the arrays.

¶ 40    But the showup occurred approximately two hours after the incident, while Oliver remained in handcuffs.  This was long after the officer's continued use of restraint exceeded the scope of the investigatory stop.  Therefore, because the showup took place after Oliver had been improperly arrested, it should have been suppressed.

¶ 41    Similarly, the GSR test on Oliver's shirt was not performed until after Oliver's detention had become an arrest.  Thus, for the same reason, the GSR results were derivative of the illegal detention and should have been suppressed.

¶ 42    In sum, the trial court erred in part by denying Oliver's motion to suppress evidence of the show-up identification and the GSR results obtained as the result of an unlawful arrest.

### 5.    The Error Requires Reversal

¶ 43    Having concluded that the trial court erred, we must determine whether the error requires reversal.  As this issue implicates Oliver's constitutional rights, we review it for constitutional harmless error.  *Hagos v. People*, 2012 CO 63, ¶ 11.  Under this standard, the People must demonstrate beyond a reasonable doubt there is no reasonable possibility that the error may have contributed to the verdict.  *Id.*  They have not done so.

¶ 44    While much of the People's properly admitted evidence could be characterized as strong, it was far from overwhelming.  The People's case significantly relied on contradictory and inconsistent eyewitness testimony.  The improperly admitted GSR found on Oliver's shirt was one of the few pieces of scientific evidence presented at trial.  As the prosecutor stated in closing arguments, the "GSR positive result means [Oliver] fired a gun, handled a gun, . . . or was in the area that a gun was fired."  In other words, the prosecution placed specific emphasis on the GSR.

¶ 45    Given the relative importance of the improperly admitted GSR evidence, we cannot say that the verdict "was surely unattributable to the error." *Bernal v. People*, 44 P.3d 184, 201 (Colo. 2002) (citation omitted).  Thus, we are unable to "declare a belief that [this error] was harmless beyond a reasonable doubt." *Hagos*, ¶ 11 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).  Reversal is therefore required.[4]

### IV.    The Show-up Identification and Subsequent In-Court Identification

¶ 46    Oliver also asserts that the trial court erred by denying his motion to suppress the show-up identification by D.T.  As stated previously, the show-up identification was derivative of the unlawful arrest and is therefore inadmissible.  However, as Oliver acknowledges, even where an out-of-court identification was itself subject to suppression as the fruit of an improper detention, a subsequent in-court identification may nevertheless be admissible if the witness had a "sufficient independent recollection of the [crime]

---

[4] We note that, because none of the improperly admitted evidence had any bearing on whether Oliver acted with intent or after deliberation, our reversal on this point does not affect our analysis of Oliver's first claim, i.e., his challenge to the sufficiency of the evidence.

to identify the defendant at trial." *People v. Suttles*, 685 P.2d 183, 187 (Colo. 1984).

¶ 47 Although D.T. testified at the motions hearing, the court limited its findings regarding his testimony to whether the showup was impermissibly suggestive, concluding that it was not. Given that we have concluded that admitting evidence of the showup was impermissible, as it flowed from an unconstitutional arrest, we need not address whether it was also unduly suggestive. Rather, the issue turns to whether D.T.'s ability to identify Oliver would be independent of the improper arrest and subsequent showup.

¶ 48 We cannot make this determination on the record before us. On remand, the trial court must determine, with additional testimony if needed, "whether the [witness has] an 'independent recollection . . . uninfluenced by the [tainted] pretrial identifications.'" *Id.* at 189 (quoting *States v. Crews*, 445 U.S. 463, 473 (1980)). If so, the court should allow D.T. the opportunity to make an in-court identification of the defendant. *Id.*

¶ 49 We therefore remand to the trial court for further proceedings.

## V.    *Batson* Violation

¶ 50    Because we reverse on the grounds stated above and remand for a new trial, we do not address whether a *Batson* violation occurred during voir dire.

## VI.    Conclusion

¶ 51    The judgment is reversed, and the case remanded for further proceedings consistent with this opinion.

JUDGE NAVARRO and JUDGE LIPINSKY concur.