22CA1355 Peo v Corey 12-26-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1355
City and County of Denver District Court No. 21CR2074
Honorable Christopher J. Baumann, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Joseph Alden Corey,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE TOW
Pawar, J., concurs
Schutz, J., specially concurs

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 26, 2024

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Assistant Solicitor
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Katherine Brien, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Joseph Alden Corey, appeals the judgment of conviction entered on a jury verdict finding him guilty of second degree murder.  We affirm.

## I.    Background

¶ 2    According to the evidence at trial, Wayne Johnson was in a volatile relationship with Dawn Perkins.  They lived in the same house, along with members of Perkins's family.  Eventually, Perkins got a protection order against Johnson, which forced him to move out of the house.

¶ 3    Corey was friends with Perkins and her family.  Some of Perkins's family members told Corey about Johnson's volatile behavior with Perkins.  Despite being restrained from doing so, Johnson would occasionally return to the house, and Perkins's family members would call the police.  One time, Perkins's family member called Corey to come over to convince Johnson to leave.  Corey went to Perkins's house and Johnson left.  Corey started staying in the garage at the house on and off and later moved into the garage.

¶ 4    Eventually, Johnson was arrested for violating the protection order, he went to jail, and a criminal protection order was put in

place.  When Johnson was released from jail, Perkins's family members told Corey.  Two nights after Johnson was released, Corey slept in his girlfriend's van parked across the street from Perkins's house.  In the morning, Johnson knocked on the door of the house.  A family member answered the door, and Johnson asked where his bike was.  The family member slammed the door after telling Johnson he was not allowed to be at the house.

¶ 5     The events that followed were captured on a neighbor's security camera.  Corey stepped out of the van with a gun, walked across the street towards Johnson and the house, and fired shots at Johnson.  Johnson walked towards Corey, reached the sidewalk, turned, and walked away from Corey.  Corey shot at Johnson's back.  Corey got back into the van, and his girlfriend drove away.  Johnson collapsed on the street around the corner, covered in blood.

¶ 6     Johnson died from his wounds.

¶ 7     Corey was charged with first degree murder.  At trial, the People's theory was that Corey waited for Johnson to come to the house and intended to kill him to prevent him from continuing to harass Perkins and her family.  Corey claimed he acted first in

defense of Perkins's family and then in self-defense.  Corey testified that Johnon was agitated, making movements with his hands, and continuing to move toward Corey.  Corey said he asked Johnson what he was doing at the door, and Johnson replied, "I told you, [d]on't get in my F-ing way, and I'm going to kill you and these stupid Bs."

¶ 8     When instructing the jury, the trial court included instructions on self-defense and the lesser included offense of second degree murder.  The jury convicted Corey of second degree murder.

¶ 9     This appeal followed.

## II.    Prosecutorial Misconduct

¶ 10    Corey contends that numerous remarks made by the prosecutor throughout the trial constituted prosecutorial misconduct.  We disagree.

### A.    Standard of Review and Applicable Law

¶ 11    We engage in a two-step analysis when reviewing claims of prosecutorial misconduct.  Wend v. People, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the conduct was improper based on the totality of the circumstances.  Id.  In doing

so, we evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury. People v. Conyac, 2014 COA 8M, ¶ 132. Next, we consider whether such actions warrant reversal under the applicable standard. *Wend*, 235 P.3d at 1096.

### B. Analysis

#### 1. Dexter and Vigilante Themes

##### a. Voir Dire

¶ 12 Corey contends that the prosecutor committed misconduct during voir dire by injecting themes of "vigilantism, anarchy, and lawless society" by repeatedly referencing the show Dexter. He also contends that the prosecutor committed misconduct when cross-examining Corey, in closing argument, and in rebuttal closing by referring to the themes introduced in voir dire. We disagree.

¶ 13 During voir dire, the prosecutor explained that the protagonist of the show, Dexter, is a serial killer who murders people who have "gotten away with murder, be it through a loophole in the justice system or some kind of corruption." The prosecutor then asked multiple jurors if what Dexter did on the show was okay, and when the jurors responded that it was not okay, the prosecutor asked

4

them why not.  The prosecutor also asked jurors about taking justice into their own hands, what was wrong with a lawless society, and if there was room for vigilantism in society.  The jurors all responded in various ways that it was not okay and discussed the problems created when someone took matters into their own hands.

¶ 14    Corey contends this line of questioning implied that he was a vigilante serial killer who hunted down murderers who otherwise were not punished by the justice system.  But we agree with the People that the prosecutor never equated Corey to Dexter or suggested that he was a serial killer or that he hunted down a murderer.  Rather, the prosecutor used Dexter as an example to explore the general concept of vigilantism with the jurors.

¶ 15    Corey also contends that the themes of "vigilantism, anarchy, and lawless society" were improper during voir dire.  But Corey cites no case holding that exploring the concept of vigilantism (or anarchy or lawless society) in voir dire is improper, nor are we aware of any.  And while our specially concurring colleague suggests that addressing these concepts was improper because they "were not legal issues in this case," *infra* ¶ 62, we respectfully

disagree.  Though not an element of the crime, a defendant's motive is often quite relevant.  *See, e.g.*, *People v. Cousins*, 181 P.3d 365, 371 (Colo. App. 2007) ("It is permissible to prove a defendant's motive for committing a crime."); *see also People v. Oliver*, 2020 COA 150, ¶ 12 (acknowledging that while proof of motive is not necessary to prove the commission of a crime, it is often relevant).

¶ 16    In short, given the facts of this case, the concept of vigilantism was an unavoidable consideration.  As a result, the prosecutor was well within her bounds to explore the potential jurors' attitudes toward vigilantism.  And, although inartful with her general references to Dexter, the prosecutor's voir dire was an attempt to uncover potential juror biases in that area.  *See People v. Shipman*, 747 P.2d 1, 3 (Colo. App. 1987) ("The only proper purpose of voir dire is to determine the bias or prejudice of a potential juror.").

   b.    Cross-Examination, Closing Argument, and Rebuttal Closing

¶ 17    While cross-examining Corey, the prosecutor asked, "[Y]ou were here during jury selection, and you heard as we talked about the dangers of being a vigilante.  Do you remember those conversations?"  Corey replied that he did.  The prosecutor then asked, "And one of those dangers is that people make mistakes"

and "[t]hey judge a situation wrongly"?  Corey agreed to both statements.

¶ 18    During closing argument, the prosecutor said,

> We cannot have a system — we cannot have a system where ordinary citizens take it upon themselves to execute other citizens based on their belief that they have done something wrong.  That is anarchy, and we cannot have a system like that.
>
> Recall what several of you said during jury selection.  The greatest danger of all is that the person that has taken it upon themselves to do this may have been wrong, and that is exactly what happened in this case.

And then the prosecutor said, "Even accepting as true that [Johnson] raised his hand and swore at him, what society would we have if that gave us legal justification to shoot and kill someone?"

¶ 19    Corey contends that these statements were improper because the prosecutor returned to the improper theme of vigilantism and sought to harvest the fruits of seeds planted during voir dire, relying on *People v. McBride*, 228 P.3d 216, 224 (Colo. App. 2009).  As discussed, exploring a vigilante theme during voir dire was not improper.  Nor do we find *McBride* persuasive.  In *McBride*, the prosecutor introduced an analogy in voir dire and returned to the

7

same analogy in rebuttal closing, but that was not what the division determined to be misconduct. Rather, the division concluded that the misconduct was the use of the analogy in rebuttal closing to make an argument that contradicted Colorado law and distorted a key element of attempted first degree murder. *Id.* at 224-25. Thus, *McBride* is inapposite.

¶ 20    Further, Corey contends that the prosecutor committed misconduct during closing argument when, "consistent with [the prosecutor's] improper themes injected during voir dire," she said, "Corey took it upon himself to act as judge, jury and executioner, and because of that . . . Johnson is dead" and in rebuttal closing when she said, "This was an execution."

¶ 21    Again, the vigilante theme was not improper during voir dire. To the extent Corey contends that the prosecutor's words were derogatory or inflammatory, we disagree that these statements constituted prosecutorial misconduct. In context, the prosecutor was arguing that the evidence supported her theory of the case that Corey acted deliberately and intentionally (and not in self-defense) because Corey — who was aware of the conflict between Perkins and Johnson — waited for Johnson and killed him to prevent

further harassment. *See People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010) (A prosecutor may "employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance" in closing argument. (quoting *People v. Collins*, 250 P.3d 668, 678 (Colo. App. 2010))).

¶ 22　　Finally, Corey contends that the prosecutor's statements made during voir dire, cross-examination, and closing argument misled and unduly influenced the jury, diverted the jury from its duty to decide the case based on the evidence, invoked community sentiment, inflamed the passions and prejudices of the jury, and sought a conviction based on matters irrelevant to guilt or innocence. This is an undeveloped argument, and we decline to address it. *See People v. Curtis*, 2021 COA 103, ¶ 36.

### 2.　Misstating the Circumstances Surrounding Corey's Self-Defense Claim

¶ 23　　Corey contends that the prosecutor also committed misconduct by misstating the law on apparent necessity, misstating the evidence, and calling Corey "delusional." We reject each contention.

¶ 24    First, Corey contends that the prosecutor's numerous statements made during closing argument and rebuttal closing that Corey relied on "unverified" reports about Johnson, rushed to judgment, was "delusional," and "was operating under this delusion and [took] it upon himself to engage" were improper because they misstated the law regarding apparent necessity.

¶ 25    "The touchstone of self-defense is 'reasonable belief rather than absolute certainty,' which can include a defendant's use of self-defense based on 'apparent necessity.'" *Castillo v. People*, 2018 CO 62, ¶ 38 (quoting *Beckett v. People*, 800 P.2d 74, 78 (Colo. 1990)). "Evidence of a victim's prior violent conduct may be admissible as direct evidence of an essential element of a defendant's claim of self-defense, namely, the reasonableness of the defendant's belief that the victim imminently would use physical force against the defendant." *People v. Vasquez*, 148 P.3d 326, 331 (Colo. App. 2006). "[I]t is immaterial whether a defendant personally witnessed the victim's prior violent act or learned of the act through the statements of others." *Id.*

¶ 26    Contrary to Corey's contention, the prosecutor did not suggest that Corey could not lawfully act based upon his reasonable belief

and apparent necessity. Rather, the prosecutor argued Corey was acting unreasonably. The prosecutor used the word "unverified" to argue that Perkins and her family were unreliable sources of information, thus making his reliance on their reports about Johnson's history of violence unreasonable. Further, in context, the prosecutor was arguing that nothing about the circumstances that day would have given Corey a reasonable belief that Johnson was imminently going to use physical force against him. Thus, the prosecutor did not misstate the law on apparent necessity.

¶ 27 Next, Corey contends that the prosecutor's statements regarding Corey relying on "unverified" reports misstated the evidence. In support of this contention Corey points to evidence that Johnson had been violent in the past. But Corey ignores all contrary evidence. Perkins's family member testified that Johnson had never been physically violent with Perkins. A detective testified that none of the calls to police about Johnson being at the house involved allegations of domestic violence, threats, assaults, or felony menacing. And Corey testified that he did not personally witness Johnson being physically violent with anyone. The prosecutor could appropriately argue from this evidence that the reports of

11

Johnson's past violence were "unverified." *See Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005) ("Final argument may properly include the facts in evidence and any reasonable inferences drawn therefrom.").

¶ 28 Finally, Corey contends that when the prosecutor called Corey "delusional," she improperly expressed her personal opinion on the veracity of Corey's testimony, used derogatory and inflammatory language, tried to inflame the passions and prejudices of the jury, and denigrated the theory of defense.

¶ 29 During defense counsel's closing argument, Corey's attorney argued that Corey had to "do something." In rebuttal, the prosecutor responded,

> I assert to you he didn't. The circumstances of March 10, 2021, did not beckon for Mr. Corey to intervene. He was delusional. Mr. Johnson wasn't doing anything. He was at the door asking for his bike, and that is it. He was not yelling threats at [Perkins's family member]. He was not yelling threats at the other people in the house. He's not trying to break into the door. That's not what was happening that day. He was there to retrieve his only form of transportation, that he says he left there when he was arrested in August, and that's all that was happening.

In our view, the use of the word delusional was an attempt to argue that Corey's belief that he had to "do something" was unreasonable, based on the circumstances. *See People v. Vialpando*, 804 P.2d 219, 225 (Colo. App. 1990) ("A prosecutor is afforded considerable latitude in the right to reply to an argument by opposing counsel."). It was, at most, an oratorical embellishment. *See Strock*, 252 P.3d at 1153.

¶ 30    Nor do we agree that the prosecutor was expressing her personal belief as to Corey's veracity or seeking to denigrate the theory of defense. Rather, the prosecutor's statement was grounded in the evidence and reasonable inferences drawn therefrom. *See Wilson v. People*, 743 P.2d 415, 418 (Colo. 1987) (recognizing the prosecution may "draw reasonable inferences from the evidence as to the credibility of witnesses").

### 3.    Misstating the Law on Duty to Retreat

¶ 31    Corey next contends that the prosecutor committed misconduct during closing argument by suggesting that Corey had a duty to retreat. We disagree.

¶ 32    During closing argument, when arguing that Corey acted after deliberation and with intent, the prosecutor said, "Corey had the

opportunity to turn around, had the opportunity to abort the mission, had the opportunity to stop, but yet he didn't." The prosecutor also said,

> There were so many avenues for [Corey] to exit. There were so many times when he could have gotten on the off-ramp, but he kept making decision after decision after conscious decision to proceed forward, and that resulted in the death of Wayne Johnson. He could have called [Perkins's family member who answered the door]. He could have called [another family member]. He could have called police.
>
> As you heard, when [the other prosecutor,] Ms. Mullin[,] was asking [the detective], there were remedies. With two protection orders in place, ultimately, Wayne Johnson might have been charged with a felony. The system would have run its normal course, instead of us being here on a first-degree murder case.
>
> [Corey] didn't — he didn't have to leave the van. He could have gotten back in the van. If, indeed, [Johnson] is saying these terrible things when [Corey's] just a couple feet from the van, turn around. Get in the van. Drive away. Call the police.

¶ 33    "In Colorado, only initial aggressors must retreat before using force in self-defense." *Cassels v. People*, 92 P.3d 951, 956 (Colo. 2004). "Accordingly, the prosecution may not argue that a defendant is barred from acting in self-defense unless [he] first

14

retreats from an encounter." *People v. Monroe*, 2020 CO 67, ¶ 20. But a defendant's decision to enter the fray may make them the initial aggressor. *Id.* at ¶ 28.

¶ 34     Corey relies on *Monroe* and argues that the prosecutor's comments were improper because Corey was not the initial aggressor. But Corey ignores that the prosecutor was asserting that Corey *was* the initial aggressor because he got out of the van and escalated the situation with Johnson, who was not being aggressive. Indeed, the trial court instructed the jury on the initial aggressor exception to self-defense, which Corey does not challenge.

¶ 35     The prosecutor's argument was grounded in evidence and reasonable inferences drawn therefrom and did not misstate the law. *See id.*

¶ 36     In sum, we conclude there was no prosecutorial misconduct.

### III.    Supplemental Jury Instructions

¶ 37     Corey contends that the trial court erred by declining to give his supplemental instructions on apparent necessity and retreat, especially in light of the purported prosecutorial misconduct of misstating the law on self-defense in closing argument. We discern no error.

## A. Additional Background

¶ 38    Before closing arguments, Corey tendered two supplemental jury instructions involving apparent necessity and no duty to retreat. The trial court declined to give these instructions, finding "these concepts are encompassed in the general self-defense instruction." The court gave the jury a self-defense instruction that tracked the model jury instruction. *See* COLJI-Crim. H:11 (2020).

## B. Standard of Review

¶ 39    We review "instructions de novo to determine whether they accurately inform the jury of the governing law," *People v. Oram*, 217 P.3d 883, 893 (Colo. App. 2009), *aff'd*, 255 P.3d 1032 (Colo. 2011), but we "review a trial court's decision to give, or not to give, a particular jury instruction for an abuse of discretion," *People v. Jones*, 2023 COA 104, ¶ 16.

## C. Analysis

¶ 40    As Corey acknowledges, divisions of this court have concluded that when the jury is given a proper self-defense instruction, the trial court does not abuse its discretion in declining to give supplemental self-defense instructions. *See Beckett*, 800 P.2d at 78 (a separate apparent necessity instruction is not necessary where

16

jury instructions adequately informed the jury that it was required to consider the defendant's reasonable belief in the "necessity of defensive action" (quoting *People v. Jones*, 675 P.2d 9, 14 (Colo. 1984))); *see also People v. Zukowski*, 260 P.3d 339, 348-49 (Colo. App. 2010).

¶ 41     The self-defense instruction told the jury that Corey was justified in using self-defense "without first retreating" if the remaining elements were met, and it repeatedly referred to Corey's "reasonable beliefs." The self-defense instruction correctly stated the law and encompassed the apparent necessity and no duty to retreat concepts. *See Beckett*, 800 P.2d at 76-78; *Zukowski*, 260 P.3d at 347-49.

¶ 42     Corey nevertheless contends that the trial court should have sua sponte reconsidered its earlier decision not to give Corey's tendered supplemental instructions after closing arguments, during which the prosecutor purportedly misstated the law on self-defense. As discussed, we reject Corey's argument that the prosecutor misstated the law in closing argument. Therefore, we discern no abuse of discretion in the trial court declining to give Corey's supplemental instructions.

17

## IV. Disposition

¶ 43　The judgment is affirmed.

JUDGE PAWAR concurs.

JUDGE SCHUTZ specially concurs.

JUDGE SCHUTZ, specially concurring.

¶ 44 I concur with the result reached by my colleagues in the majority. I also agree with the majority's well-reasoned analysis of the issues presented with the exception of the prosecutorial misconduct analysis, *supra* Part II.B.1. Unlike my colleagues, I conclude that the prosecutor's repeated references to the television series Dexter and the associated themes of vigilantism, anarchy, and lawlessness during voir dire, Corey's cross-examination, and closing argument were improper. But because I conclude that the improper argument did not so undermine the fundamental fairness of the trial that it casts serious doubt on the reliability of the conviction, I agree that reversal is not required. *See Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 45 I therefore concur with the result reached by the majority. I write separately, however, to explain the basis for my conclusion that the prosecutor's conduct was improper, and my concerns over the all too frequent use of similar inflammatory rhetorical devices by prosecutors.

## I. Standard of Review and Applicable Law

¶ 46 The parties agree that defense counsel failed to object to the prosecutor's repeated references to the television series Dexter. Thus, I review for plain error. An error is plain if it is obvious and substantial. *Id.* Reversal for plain error is warranted only if the error undermines the fairness of the trial to a degree that it casts serious doubt on the reliability of the conviction. *Id.*

¶ 47 Criminal trials are an adversary process. Thus, as the People's advocate, prosecutors are allowed "wide latitude in the language and presentation style used to obtain justice" during closing argument. *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005). Moreover, "[g]iven the sometimes fuzzy line between hard-but-fair blows and foul blows, and because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of [the] doubt where remarks are 'ambiguous,' or simply 'inartful.'" *People v. McBride*, 228 P.3d 216, 221 (Colo. App. 2009) (citations omitted).

¶ 48 The question of whether a prosecutor's argument crosses the line between permitted advocacy and prohibited prejudicial conduct is entrusted, in the first instance, to the trial court's sound

20

discretion. *People v. Duncan*, 2023 COA 122, ¶ 30. But even when a trial court does not exercise its discretion to prohibit a prosecutor's improper argument, our appellate courts have not hesitated to correct such omissions when the error is obvious and substantial. *See Harris v. People*, 888 P.2d 259, 265 (Colo. 1995) ("[I]f an appellate court concludes that prejudice created by a prosecutor's conduct was so great as to result in a miscarriage of justice, a new trial may be granted notwithstanding the trial court's failure to impose such sanction.").

¶ 49   The supreme court has developed numerous standards to assist courts in defining the limits of proper prosecutorial advocacy. *Id.* at 264. Thus, the court has concluded that it is improper for a prosecutor to use arguments calculated to inflame the passions or prejudices of a jury. *People v. Oliver*, 745 P.2d 222, 228 (Colo. 1987). It is also improper for prosecutors to encourage a jury to retaliate against a defendant; rather, the "prosecutor's argument should be restricted to the evidence and reasonable inferences to be drawn therefrom on the issue of whether guilt is proven beyond a reasonable doubt." *People v. Ferrell*, 613 P.2d 324, 326 (Colo. 1980).

¶ 50　These essential principles are so well entrenched that they are embodied in standards promulgated by the American Bar Association to define the proper scope of prosecutorial advocacy. *See* ABA Standards for Criminal Justice, Prosecution Function (4th ed. 2017), https://perma.cc/FCN4-QPAY.  Thus, in voir dire, prosecutors should ask prospective jurors questions "solely to obtain information relevant to the well-informed exercise of challenges" and should not use "[v]oir dire . . . to argue [their] case to the jury."  *Id.* § 3-6.3(d).  And in closing argument, "the prosecutor should present arguments and a fair summary of the evidence that proves the defendant guilty beyond reasonable doubt."  *Id.* § 3-6.8(a).  Conversely, the "prosecutor should not make arguments calculated to appeal to improper prejudices of the trier of fact.  The prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the trier from that duty."  *Id.* § 3-6.8(c).

¶ 51　These precepts are also incorporated into Colorado Rule of Professional Conduct 3.4(e): "A lawyer shall not . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant

or that will not be supported by admissible evidence . . . or state a personal opinion as to . . . the guilt or innocence of an accused."

¶ 52　These rules derive from the fact that prosecutors are differently situated than a typical advocate in the judicial arena. "Prosecutors have a higher ethical responsibility than other lawyers because of their dual role as both the sovereign's representative in the courtroom and as advocates for justice." *Domingo-Gomez*, 125 P.3d at 1049. "Because the prosecutor represents the State and the People of Colorado, their 'argument is likely to have significant persuasive force with the jury.'" *Id.* (citation omitted).

¶ 53　Diligent assessment of the bounds of prosecutorial misconduct is essential. Courts should evaluate "the context in which challenged prosecutorial remarks are made . . ., including the nature of the alleged offenses and the asserted defenses, the issues to be determined, the evidence in the case, and the point in the proceedings at which the remarks [are] made" while bearing in mind that "[i]rrelevant issues or evidence may not be injected into the case at any juncture." *Harris*, 888 P.2d at 266.

## II.    Analysis

### 1.    Additional Facts

¶ 54    The prosecutor's improper references to the fictional serial killer Dexter were pervasive and permeated this trial from beginning to end.  The prosecution began by describing the premise of Dexter in voir dire:

> Dexter is a forensic bloodstain analyst by day. He works for the Miami-Dade Police Department, and he's a fictional character on, I believe, Netflix.  But at night, he leads a secret, parallel life where he hunts down — he's a serial killer, and he hunts down people who have — he believes have gotten away with murder, be it through a loophole in the justice system or some kind of corruption, okay?

¶ 55    After setting that stage, the prosecutor engaged prospective juror M.C. in the following exchange:

> Q.  But what Dexter does, is [it] okay?
>
> A.  No.
>
> Q.  Why not?
>
> A.  Because of the chance of error, simply because of that alone.  He's not going to be right 100 percent of the time, even if he thinks he is.
>
> Q.  And so what's the downside then?

A. I mean, compounding the injustice that was done in the first place, punishing [an] innocent person and letting a guilty person go.

Q. So the chance of error. Okay. Thank you.

¶ 56 The prosecutor continued the same line of inquiry with prospective juror K.O.:

Q. All right. . . ., you raised — you also see Dexter. What do you think? Is it okay if he's out there doing this? Taking out the —

A. Not really. He's a vigilante, and he's going above what was there, although sometimes he goes after people that aren't even on the radar.

Q. He does.

A. That just kind of gets — that kind of goes over the edge, because, how does he know?

Q. How does he know?

A. You know, he hears, maybe, a couple of keywords or something, and then he's — or sees an accident, and he goes, I got to look at this.

Q. Right.

A. And then he goes from there, and then he decides, you know, this guy's got to go.

¶ 57 The prosecutor proceeded to repeat this same line of questioning with an additional fourteen prospective jurors, repeatedly invoking themes of lawlessness, vigilantism, and

25

anarchy. Four of the prospective jurors who the prosecutor directly examined served as jurors on this case. And all the seated jurors were present when all sixteen of the prospective jurors were examined in a similar manner concerning Dexter and the related prosecutorial themes.

¶ 58    The prosecutor referenced these voir dire discussions during the trial, including during the cross-examination of Corey:

> Q. Now, Mr. Corey, you were here during jury selection, and you heard as we talked about the dangers of being a vigilante. Do you remember those conversations?
>
> A. Yes, I do.
>
> Q. And one of those dangers is that people make mistakes.
>
> A. Yes, ma'am.
>
> Q. They judge a situation wrongly.
>
> A. Yes, ma'am.

The prosecutor then proceeded to question Corey about the factual basis of his testimony, suggesting that his statements about the threat and proximity posed by the victim were mistaken. The clear purpose of these questions was to suggest that Corey's perceptions

about the alleged threat Johnson posed were distorted like those of the character in Dexter, by his lawless vigilantism.

¶ 59    The prosecution drove the direct comparison home during her initial closing argument:

> We cannot have a system — we cannot have a system where ordinary citizens take it upon themselves to execute other citizens based on their belief that they have done something wrong. That is anarchy, and we cannot have a system like that.
>
> Recall what several of you said during jury selection. The greatest danger of all is that the person that has taken it upon themselves to do this may have been wrong, and that is exactly what happened in this case.

The prosecutor summed up her initial closing argument with the following statement: "Ladies and gentlemen, Joseph Corey took it upon himself to act as judge, jury and executioner, and because of that, Wayne Johnson is dead."

¶ 60    Rebuttal closing is the last substantive thing the jury hears before it begins its deliberations and, therefore, has a disproportionate impact on jurors. *See Domingo-Gomez,* 125 P.3d at 1052 ("Rebuttal closing is the last thing a juror hears from counsel before deliberating, and it is therefore foremost in their

thoughts."). Near the completion of her rebuttal closing, the prosecutor invoked her well-developed rhetorical theme a final time: "This was an execution. Period."

### 2. Obvious and Substantial Error

¶ 61 Given the prosecutor's repeated use of the Dexter-related themes of anarchy, lawlessness, and vigilantism, I must respectfully disagree with my colleagues' characterization of these arguments as merely "inartful." *Supra* ¶ 16. This was not a passing, unforeseen comment made in the heat of argument. *See McBride*, 228 P.3d at 221 (excusing unscripted inartful comments made on the heat of trial). To the contrary, the use of the Dexter analogy was a carefully scripted effort to compare the actions of Corey to that of a vigilante serial killer. And the prosecutor used the comparison, and resulting juror statements, to suggest that Corey's unlawful desires lead him to misperceive Johnson's actions, thereby undermining the facts he testified to in support of his theories of defense.

¶ 62 Nor am I persuaded by the majority's conclusion that "the prosecutor never equated Corey to Dexter" but rather "used Dexter as an example to explore the general concept of vigilantism with the jurors." I reject this effort to excuse the prosecutor's misconduct.

28

In the first instance, concepts of vigilantism and anarchy were not legal issues in this case. Corey did not, and indeed could not have, asserted that his conduct was excused because Johnson deserved to be killed. Rather, his claims were defense of others and self-defense, principles firmly established under Colorado law. *See* § 18-1-704(1), C.R.S. 2024 (Subject to certain limitations, "a person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose."). In my estimation, the prosecutor injected the concepts of vigilantism, anarchy, and lawlessness as rhetorical straw men, designed to marginalize Corey and his theories of defense.

¶ 63 And having constructed the straw men, the prosecution chose to attack them using a highly prejudicial analogy to the actions of a serial killer. Moreover, even if one accepts the majority's conclusion that it was appropriate to explore concepts of vigilantism, there was absolutely zero need to explore those concepts by analogy to the actions of serial killer. To state the obvious, the prosecutor could

have simply asked a prospective juror, "What are the risks of taking revenge or acting outside the law?" To my reading, using the Dexter analogy to explore these irrelevant concepts reflects the prosecutor's intent to prejudice the jury against Corey.

¶ 64 Finally, I cannot excuse the prosecutor's rhetorical devices as a proper analogy. The supreme court rejected a similar argument in *Harris*, where the prosecutor compared the defendant to Sadaam Hussein. 888 P.2d at 262. In doing so, the supreme court reminded us that a prosecutor's closing argument is more than just a forensic exercise:

> These multiple references to the character of Saddam Hussein, the military operations in the Persian Gulf, and the bravery of American troops may well reflect creative inspiration and rhetorical sophistication — attributes admirable in any advocate. However, as our decisions have established, presentation of closing arguments is not simply an exercise in oratorical skill. . . . Repeated references to events occurring outside the courtroom, involving persons not party to the proceedings, can all too easily encourage jurors to abandon their role of evaluating the evidence under circumscribed legal standards. While argumentative devices may properly be employed to strengthen a point or a perspective, they cannot be utilized to turn the impartial quest for truth into an impassioned expression of anger.

*Id.* at 266.

¶ 65     Applying these principles, the supreme court concluded, "Whether resulting from carefully planned strategy, from inspired rhetorical creativity, or from other causes, the prosecutor's comments repeatedly encouraged the jurors to compare Harris and his conduct to conduct and personalities irrelevant to the case." *Id.* Thus, applying the plain error standard the court concluded that the trial court's failure to correct the prosecutor's improper conduct was an obvious and substantial error. *Id.* at 266-67.

¶ 66     A couple of additional broader points bear mentioning. Unfortunately, our trial and appellate courts are too often confronted with addressing whether a prosecutor has engaged in improper conduct, particularly when addressing a jury. Some of this activity is attributable to the sometimes gray line between permissible advocacy and rhetorical excess. And in some instances, such issues are attributable to defense counsel's unfounded effort to search for error that would justify a mistrial or reversal. But too often, the issue arises because the prosecutor has elected to push or exceed the boundaries of permissible argument.

¶ 67    It is important for prosecutors to recognize and reflect on the unique and special role with which they have been entrusted.  Their polestar is not victory, it is justice.  *Garcia v. People*, 2022 CO 6, ¶ 18 n.6 ("A prosecutor's ultimate goal is justice, which is not always synonymous with victory.").  The effective fulfillment of this essential role requires a significant measure of self-restraint.  Given the emotionally charged circumstances of many criminal accusations, an inclination to succumb to clever rhetorical devices can blur professional conscience.  And as illustrated by the circumstances of this case, our forgiving standards of reversal do not provide a reliable means of deterrence against such excesses.

¶ 68    In the end, the criminal justice system is dependent upon the unflinching professionalism of prosecutors.  Across this state, many prosecutors consistently meet that challenge.  But most is not sufficient; we need all prosecutors to assume that mantle.

### 3.    Impact on Judgment of Conviction

¶ 69    Despite my conclusion that the prosecutor made repeated improper references to Dexter, vigilantism, and anarchy, I cannot conclude that the trial court's error in permitting such conduct rises to the level of reversible plain error.  Aside from Corey's

testimony, no evidence supported the conclusion that Johnson threatened anyone on the day he was murdered. The person who answered the door in response to his knock stated that Johnson simply inquired about his bike. And there was no evidence that Johnson was armed or attempted to enter the home.

¶ 70    Contradicting Corey's testimony, the prosecution introduced a door camera video that captured the shooting. The video showed Corey exiting the van where he had spent the night and walking toward Johnson with his pistol drawn. The video captured Corey firing three shots as Johnson was walking towards him. The video then showed Johnson turning to walk away from Corey. When Johnson was approximately ten feet from Corey and heading away from him, Corey fired the fatal shot into Johnson's back. This video provided the jury with overwhelming evidence that Corey was not acting in defenses of others or himself when he killed Johnson. Given this undisputed evidence, I cannot conclude that the prosecutor's improper conduct "cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14 (citation omitted). Accordingly, I conclude that the trial court's error was harmless.

### III. Conclusion

¶ 71    For these reasons, I agree with my colleagues' conclusion that Corey's conviction must be affirmed.